16 P.3d 583 (2001)
142 Wash.2d 801
Dianne L. COCKLE, Respondent,
v.
The DEPARTMENT OF LABOR AND INDUSTRIES of the State of Washington, Petitioner.
No. 68539-8.
Supreme Court of Washington, En Banc.
Argued March 7, 2000.
Decided January 18, 2001.
*584 Christine Gregoire, Atty. Gen., John R. Wasberg, Asst. Atty. Gen., Seattle, for Petitioner.
Terry James Barnett, Tacoma, for Respondent.
Nancy Thygesen Day, Seattle, Amicus Curiae on Behalf of Washington Self-Insurers Association.
William D. Hochberg, Edmonds, Amicus Curiae on Behalf of Washington State Labor Council.
BRIDGE, J.
We are asked for the first time to decide whether the value of employer-provided health care coverage is included in the basis used to calculate workers' compensation payments under RCW 51.08.178.
The Department of Labor and Industries calculated Respondent Dianne Cockle's workers' compensation payments based strictly on her paycheck at the time of her work-related injury. RCW 51.08.178(1) mandates that "wages' shall include the reasonable value of board, housing, fuel, or other consideration of like nature received from the employer as part of the contract of hire ..." (emphasis added). We conclude that Cockle's health care coverage was "consideration of like nature" to "board, housing [and] fuel" in that it represented a readily identifiable and reasonably calculable in-kind component of her lost earning capacity at the time of injury that is critical to protecting workers' basic health and survival. We affirm the Court of Appeals' ruling, with modifications, and remand to the Department for recalculation of her workers' compensation payments.

*585 FACTS
On November 4, 1993, Dianne Cockle was injured in the course of her employment for the Pierce County Rural Library District. She had been working 40 hours a week and, in accordance with her written employment contract, was being paid $5.61 an hour plus medical and dental care coverage, for which her employer paid premiums of $205.52 a month.[1] The parties stipulated that the coverage was worth "approximately 20 percent of her monetary compensation." Br. of Appellant at 34.
Initially, Cockle was unable to work at all, qualifying her for temporary total disability (time-loss) compensation under RCW 51.32.090(1). From June 6, 1994, to October 24, 1994, though, she was able to return to work, but only part-time, qualifying her for temporary partial disability (loss of earning power) compensation under RCW 51.32.090(3)(a)(ii). Cockle's health care coverage was suspended from the date of her injury until June 6, 1994, and from August 1, 1994, through October 24, 1994, because she was not working enough hours to qualify under the rules of her employer's health care program.
The Department calculated Cockle's compensation based strictly on her paycheck earnings at the time of the injury. She appealed to the Board of Industrial Insurance Appeals, arguing that her health care coverage was a substantial component of her negotiated "contract of hire" compensation and thus part of her "wages" as defined in RCW 51.08.178. The Board disagreed and affirmed the Department's order. She then appealed to the Pierce County Superior Court, which granted her partial summary judgment, finding that health care coverage represented "other consideration of like nature received from the employer as part of the contract of hire," RCW 51.08.178(1), and thus should have been included in the calculation of Cockle's "wages." The Court of Appeals, Division Two, affirmed in a published opinion. Cockle v. Dep't of Labor & Indus., 96 Wash.App. 69, 977 P.2d 668 (1999). We granted the Department's petition for discretionary review.

ANALYSIS
Time-loss and loss of earning power compensation rates are determined by reference to a worker's "wages," as that term is defined in RCW 51.08.178, at the time of the injury. See RCW 51.32.090(1) (referencing RCW 51.32.060) and RCW 51.32.090(3)(a)(ii). We are asked to construe RCW 51.08.178, which provides, in relevant part,[2]
For the purposes of this title, the monthly wages the worker was receiving from all employment at the time of injury shall be the basis upon which compensation is computed unless otherwise provided specifically in the statute concerned.
....
The term "wages" shall include the reasonable value of board, housing, fuel, or other consideration of like nature received from the employer as part of the contract of hire, but shall not include overtime pay except in cases under subsection (2) of this section.
Statutory construction is a question of law and is reviewed de novo. Stuckey v. Dep't of Labor & Indus., 129 Wash.2d 289, 295, 916 P.2d 399 (1996). The primary goal *586 of statutory construction is to carry out legislative intent. Rozner v. City of Bellevue, 116 Wash.2d 342, 347, 804 P.2d 24 (1991). If a statute is plain and unambiguous, its meaning must be primarily derived from the language itself. Dep't of Transp. v. State Employees' Ins. Bd., 97 Wash.2d 454, 458, 645 P.2d 1076 (1982).
The Department argues that the meaning of the term "wages" is made clear in various dictionary entries and other statutory provisions, which often use the term in contradistinction to in-kind "benefits." Cockle cites entries from the Black's Law Dictionary where the term "wages" expressly includes in-kind "benefits." The Court of Appeals found that a dictionary in use in 1971, when RCW 51.08.178 was enacted, states that the term wages "`often includ[es] ... amounts paid by the employer for insurance, pension, hospitalization, and other benefits.'" Cockle, 96 Wash.App. at 86 & n. 47, 977 P.2d 668 (emphasis omitted) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2568 (1969)).
Words are not to be given their ordinary meaning when a contrary intent is manifest. Dennis v. Dep't of Labor & Indus., 109 Wash.2d 467, 479-80, 745 P.2d 1295 (1987). Thus, even if the Department is correct in its attribution of the "ordinary" dictionary meaning of "wages," RCW 51.08.178 expressly expands that definition to include the "reasonable value" of in-kind work benefits such as "board, housing [and] fuel." That definitional expansion clearly removes the term from its arguably more common usage and makes it manifest that the Legislature intended to include in "wages" the value of at least some in-kind work "benefits."
The Legislature's definition of "wages" includes the critical phrase "other consideration of like nature." When statutory language is susceptible to more than one reasonable interpretation, it is considered ambiguous. Harmon v. Dep't of Soc. & Health Servs., 134 Wash.2d 523, 530, 951 P.2d 770 (1998). The parties proposed several reasonable interpretations of the phrase "other consideration of like nature" in RCW 51.08.178(1). We therefore find the phrase ambiguous and resort to principles of statutory construction, legislative history, and relevant case law to assist us in discerning legislative intent. Id.; see also State v. Bash, 130 Wash.2d 594, 601-02, 925 P.2d 978 (1996).
"Ejusdem generis" is a well-established rule of statutory construction:
In the construction of laws, wills, and other instruments, the `ejusdem generis rule' is, that where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned.
BLACK'S LAW DICTIONARY 517 (6th ed.1990); see generally City of Seattle v. State, 136 Wash.2d 693, 699, 965 P.2d 619 (1998). The parties dispute which attribute shared by "board, housing [and] fuel" is of such significance that it should determine the boundaries of the larger category of "other consideration of like nature." The Department proposes the following criteria: "(1) tangibility, (2) regularity and certainty of realization, (3) manner and case of valuation, (4) reasons why and manner in which employers provide and account for them, and (5) general manner in which they are treated for tax purposes." Suppl. Br. of Pet. at 3. Cockle emphasizes the in-kind "nature" of "board, housing [and] fuel" as the unifying characteristic. In Cockle's view, these early twentieth century[3] examples of in-kind forms of "consideration... received from the employer as part of the contract of hire" are expressly *587 included "to ensure that compensation not be excluded from `wages' simply because it is paid in a form other than money." See Br. of Resp't at 20, 25-26.
It is well settled that statutes must not be construed in a manner that renders any portion thereof meaningless or superfluous. Stone v. Chelan County Sheriff's Dep't, 110 Wash.2d 806, 810, 756 P.2d 736 (1988). The Legislature here decided against restricting qualifying benefits to a closed list of enumerated items.[4] It also chose the word "consideration," a term understood broadly in the law[5] and used in the definition of "wages" in the workers' compensation acts of few, if any, other jurisdictions. On the other hand, it did not mandate inclusion in "wages" of "any other consideration," but rather of "other consideration of like nature," suggesting that a more limited ejusdem generis construction was intended. The Legislature's specific choice of words thus rules out both exceedingly narrow and exceedingly broad readings of the phrase "other consideration of like nature received from the employer as part of the contract of hire."
We next turn to the legislative history of RCW 51.08.178. Washington enacted its "Compensation of Injured Workmen" act in 1911. Laws of 1911, ch. 74, at 345. For the next 60 years, all compensation rates were uniformly fixed by the Legislature. Id. at ch. 74 § 5, at 356. In 1971, though, "the first major revision of this State's 60-year-old workmen's compensation law" was passed. "Suggested Material for Governor's Veto Message," Bill File, Evans Leg. Box 2S-3-49, EHB 735 (Wash.1971). The revision added a "wages" section to Title 51's definitional chapter and made compensation in many cases proportional to a worker's actual "wages" at the time of injury. RCW 51.08.178(1).
This change had at least three perceived benefits. First, the change "will assure a more equitable and realistic basis for compensation." "Explanatory Comments on Proposed Industrial Insurance Legislation," by Dep't of Labor & Indus. (Dec. 17, 1970), Issue File, Evans Leg. Box 2S-3-46 (Wash. 1971) at 3. Second, "the change will have an incentive effect of reducing the number of cases where time-loss benefits exceed the wages that would otherwise have been earned." Id. Third, compensation levels would automatically keep pace with wage increases, making it unnecessary "to go to the legislature with hat in hand each time a benefit increase is sought." Text of Address to State Labor Council, AFL-CIO, by William C. Jacobs, Dir., Dep't of Labor & Indus. (Aug. 25, 1970), Issue File, Evans Leg. Box 2S-3-46 (Wash.1971) at 10.
The 1971 Legislature also codified a principle already long recognized by our courts: "This Title shall be liberally construed for the purpose of reducing to a minimum the suffering and economic loss arising from injuries and/or death occurring in the course of employment." RCW 51.12.010. In other words, where reasonable minds can differ over what Title 51 provisions mean, in keeping with the legislation's fundamental purpose, the benefit of the doubt belongs to the injured worker:
[T]he guiding principle in construing provisions of the Industrial Insurance Act is that the Act is remedial in nature and is to be liberally construed in order to achieve its purpose of providing compensation to all covered employees injured in their employment, with doubts resolved in favor of the worker.
Dennis v. Dep't of Labor & Indus., 109 Wash.2d 467, 470, 745 P.2d 1295 (1987) (citing cases both predating and postdating the *588 1971 codification of this principle); see also Double D Hop Ranch v. Sanchez, 133 Wash.2d 793, 798, 947 P.2d 727, 952 P.2d 590 (1997).
Since the 1971 revision of Title 51, this court has emphasized that an injured worker should be compensated based not on an arbitrarily set figure, but rather on his or her actual "lost earning capacity." Double D Hop Ranch, 133 Wash.2d at 798, 947 P.2d 727 (citing Kilpatrick v. Dep't of Labor & Indus., 125 Wash.2d 222, 230, 883 P.2d 1370, 915 P.2d 519 (1994)). At the time of injury, Cockle was capable of earning not merely $5.61 an hour, but $5.61 an hour plus full health care coverage, an amount stipulated to be worth about one-fifth of her total remuneration, all of which she lost due to the injury.
The Department, however, contends that we should defer to its interpretation of RCW 51.08.178, since it is the agency charged with administering Title 51. See Multicare Med. Ctr. v. Dep't of Soc. & Health Servs., 114 Wash.2d 572, 589, 790 P.2d 124 (1990). Especially so, the Department asserts, since it has long excluded employer-provided benefits such as health care coverage from its computation of workers' compensation, and yet the Legislature has left unaltered the phrase "board, housing, fuel, or other consideration of like nature received from the employer as part of the contract of hire" in RCW 51.08.178. See Seattle-King County Council of Camp Fire v. Dep't of Revenue, 105 Wash.2d 55, 65-66, 711 P.2d 300 (1985) (citing Hart v. Peoples Nat'l Bank, 91 Wash.2d 197, 201, 588 P.2d 204 (1978)).
While we may "defer to an agency's interpretation when that will help the court achieve a proper understanding of the statute," Clark County Natural Resources Council v. Clark County Citizens United, Inc., 94 Wash.App. 670, 677, 972 P.2d 941 (1999), such interpretation is not binding on us. City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 136 Wash.2d 38, 46, 959 P.2d 1091 (1998) (citing Overton v. Econ. Assistance Auth., 96 Wash.2d 552, 555, 637 P.2d 652 (1981)). Indeed, we have deemed such deference "inappropriate" when the agency's interpretation conflicts with a statutory mandate. Dep't of Labor & Indus. v. London, 117 Wash.2d 122, 127, 814 P.2d 626 (1991). "[B]oth history and uncontradicted authority make clear that it is emphatically the province and duty of the judicial branch to say what the law is[ ]" and to "determine the purpose and meaning of statutes...." Overton, 96 Wash.2d at 555, 637 P.2d 652. Moreover, legislative acquiescence can never be interpreted as permission to ignore or violate statutory mandates. Here, the Department's construction of RCW 51.08.178(1) gives little, if any, meaning to the statutory requirement that the "reasonable value" of all "other consideration of like nature" be included in the calculation of an injured worker's "wages." Such a construction cannot be reconciled with the Legislature's statutory mandate that all Title 51 provisions "shall be liberally construed for the purpose of reducing to a minimum the suffering and economic loss arising from injuries and/or death occurring in the course of employment." RCW 51.12.010. We therefore reject the Department's construction of RCW 51.08.178(1).
The Department further contends that logical inferences from other statutory provisions suggest the Legislature did not intend inclusion of health care coverage in the "wages" formula of RCW 51.08.178.
First, the Department notes that some Title 51 provisions have capped monthly compensation at levels between 100 and 150 percent of the state's "average monthly wage." See, e.g., RCW 51.32.050(3); RCW 51.32.050(5); RCW 51.32.060(5); RCW 51.32.090(3)(a)(ii); RCW 51.32.090(7). RCW 51.08.018 defines that "average monthly wage" as one-twelfth of the state's "average annual wage" as calculated for purposes of the Unemployment Security Act in RCW 50.04.355. That act, in turn, expressly excludes from "wages" any payments made to or on behalf of workers or their dependents "on account of (a) retirement, or (b) sickness or accident disability, or (c) medical or hospitalization expenses in connection with sickness or accident disability or (d) death[.]" RCW 50.04.330(1).
A more careful review of the legislative history of RCW 51.08.018, however, refutes *589 the Department's inference. The bill as drafted and passed by the 1971 Legislature actually required the Department to calculate its own, separate "average monthly wage in the state" for purposes of Title 51 calculations based on "the total wages"as that term is defined in RCW 51.08.178-reported to it during the prior year ending June 13. Laws of 1971, 1st Ex. Sess., ch. 289, at 1558. That clause did not become law only because the Governor creatively used his line-item veto power to delete it from RCW 51.08.018 and make permanent instead the Legislature's interim provision referencing Title 50's "average annual wage." In his "Veto Message," the Governor explained that, as enacted, RCW 51.08.018
appears to require a rather complicated formula which would create administrative difficulties for the Department of Labor and Industries in determining the statewide average wage for purposes of the workmen's compensation laws. There presently exists a requirement that the Employment Security Department determine the statewide average wage under the Unemployment Compensation Law.... I see no substantial reason for two departments of state government to be independently calculating this figure....
Laws of 1971, 1st Ex.Sess., ch. 289, at 1590. Thus, Title 51's reference to Title 50's "average annual wage" in no way clarifies whether the 1971 Legislature intended employer-provided health care coverage to be included in Title 51's "wages" definition. The fact that current law excludes employee health payments from a figure used in limited situations to cap compensation at between 100 and 150 percent of the state's "average monthly wage" simply does not prove what the Department claims it does.
Secondly, the Department notes that RCW 51.32.090(4)(c), a provision added in 1993, mandates that "any employee health and welfare benefits that the worker was receiving at the time of injury shall continue or be resumed at the level provided at the time of injury." RCW 51.32.090(4)(c). However, the fact that the Legislature, after hearing from various interest groups, chose to require employers to reinstate the preexisting health care benefits of workers suffering temporary partial disability does not logically require the Department's reading of RCW 51.08.178(1). Rather, consistent with the purposes of the act, it means that restoration of a recovering worker's preexisting health benefits reduces the "actual difference between the worker's present wages and earning power at the time of injury" under RCW 51.32.090(3)(a)(ii), mitigating the loss of earning power accordingly.
The Department warns against including the value of employer-provided health care coverage in "wages," lest double recovery occur where such coverage is continued during the disability period. However, as the Court of Appeals noted:
The facts here do not require that we address this argument, for the library did not continue Cockle's insurance during the period of her disability. We comment, however, that time-loss compensation is meant "to reflect ... lost earning capacity," not retained earning capacity. When an injured worker retains his or her health insurance, he or she retains that part of his or her earning capacity, and his or her time-loss compensation should be computed accordingly.
Cockle, 96 Wash.App. at 81, 977 P.2d 668 (footnote omitted).[6]
Foreign jurisdictions have split over what work benefits are properly included in "wages" for purposes of determining workers' compensation. See Tabor v. Levi Strauss & Co., 33 Ark.App. 71, 76-77, 801 S.W.2d 311 (1990) (surveying split of authority). But we have already noted the danger in using foreign case law to construe Title 51 provisions:

*590 Before discussing cases from other states it should be mentioned that the [workers' compensation] statutes in other states are different from ours. In 1916 we said in Stertz v. Industrial Insurance Commn., 91 Wash. 588, 604, 158 P. 256 (1916), "[t]o seek authority in the decisions of other states is useless, for other statutes have no resemblance to ours."
Thompson v. Lewis County, 92 Wash.2d 204, 208-09, 595 P.2d 541 (1979); see also Sacred Heart Med. Ctr. v. Dep't of Labor & Indus., 92 Wash.2d 631, 639, 600 P.2d 1015 (1979) (Stafford, J., dissenting) ("[W]e consistently have held that our industrial insurance act is unique and that the opinions of other states' courts are of little assistance as an interpretative medium.")
The Department relies heavily, however, as have several state courts, on a 1983 United States Supreme Court decision involving the calculation of compensation for the family of James Hilyer, who was fatally run over by a cement truck while helping to build the District of Columbia Metrorail System. See Morrison-Knudsen Constr. Co. v. Dir., Office of Workers' Comp. Programs, 461 U.S. 624, 626, 103 S.Ct. 2045, 76 L.Ed.2d 194 (1983).[7] The Court was asked to construe the following "wages" clause in the 1927 Longshore and Harbor Workers' Compensation Act (LHWCA) (33 U.S.C. § 901), incorporated into the District of Columbia Workmen's Compensation Act at issue in that case:
"`Wages' means the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of injury, including the reasonable value of board, rent, housing, lodging, or similar advantage received from the employer, and gratuities received in the course of employment from others than the employer."
461 U.S. at 629, 103 S.Ct. 2045 (quoting former 33 U.S.C. § 902(13)). Professor Arthur Larson, author of a leading treatise on workers' compensation law, personally argued the case on behalf of the Morrison-Knudsen Construction Company.[8]Id. at 625, 103 S.Ct. 2045. At issue were the employer's contributions to union trust funds as required by a collective bargaining agreement: $0.28 into the Health and Welfare Fund, $0.35 into the Pension Fund, and $0.05 into the Training Fund, for each hour worked by each employee. Id. at 627 n. 3, 103 S.Ct. 2045.
Writing for the majority, Chief Justice Burger argued that the value of this employer-provided benefit was too difficult to ascertain precisely:
Board, rent, housing, or lodging are benefits with a present value that can be readily converted into a cash equivalent on the basis of their market values.
The present value of these [union] trust funds is not, however, so easily converted into a cash equivalent.... The employer's cost is irrelevant in this context; it measures neither the employee's benefit nor his compensation.
Id. at 630, 103 S.Ct. 2045. The majority opinion stressed how removed a worker was from the benefits:
Nor can the value of the funds be measured by the employee's expectation interest in them, for that interest is at best speculative. Employees have no voice in the administration of these [union] plans *591 and thus have no control over the level of funding or the benefits provided. Furthermore, the value of each fund depends on factors that are unpredictable. The value to the Hilyer family of the Health and Welfare Fund depends on its need for the services the Fund provides....
Id. at 631, 103 S.Ct. 2045.
Justice Thurgood Marshall, dissenting, sided with the lower court, Hilyer v. Morrison-Knudsen Constr. Co., 670 F.2d 208 (D.C.Cir. 1981), and with "[t]he only other Court of Appeals to address this question," Duncanson-Harrelson Co. v. Dir., Office of Workers' Comp. Programs, 686 F.2d 1336 (9th Cir. 1982). Morrison-Knudsen, 461 U.S. at 638 n. 1, 103 S.Ct. 2045 (Marshall, J., dissenting). Regarding the majority's anxiety over precisely measuring the value of a given benefit, Justice Marshall wrote:
In my view, it is better to be roughly right than totally wrong. The trust funds obviously have some value for employees and simply to exclude them from consideration is hardly an appropriate response to uncertainty about their precise value. In addition, the statute itself calls only for inclusion of "the reasonable value" of noncash items....
461 U.S. at 642, 103 S.Ct. 2045 (Marshall, J., dissenting) (citations omitted).
The LHWCA provision defining "wages" had been "lifted almost verbatim" from New York's workers' compensation act, regarding which that state's Court of Appeals had written more than a decade earlier, "`[c]ompensation awarded the employee is... based on loss of earning power ....'" 461 U.S. at 640-41, 103 S.Ct. 2045 (Marshall, J., dissenting) (quoting Winfield v. N.Y. Cen. & Hudson River R.R., Co., 216 N.Y. 284, 289, 110 N.E. 614 (1915), rev'd on other grounds, 244 U.S. 147, 37 S.Ct. 546, 61 L.Ed. 1045 (1917)). Embracing the lost earning power standard, Justice Marshall wrote:
For the purposes of determining a worker's earning power, there is no principled distinction between direct cash payments and payments into a plan that provides benefits to the employee. If the employer had agreed to pay some fixed amount of money to its employees who, in turn, paid the amount into benefit funds, that amount would satisfy the majority's definition of wages since the benefit has "a present value that can be readily converted into a cash equivalent on the basis of [its] market valu[e]." In my view, the result should not change simply because the company agrees to eliminate an unnecessary transaction by paying the contributions directly to the trust funds.
461 U.S. at 641, 103 S.Ct. 2045 (Marshall, J., dissenting) (citations omitted).
In 1983, when Morrison-Knudsen was decided, in-kind work benefits already "constitute[d] over 15% of employers' compensation costs," 461 U.S. at 641, 103 S.Ct. 2045 (Marshall, J., dissenting), and Justice Marshall predicted that they "could easily constitute more than one-third of labor costs by the middle of the [twenty-first] century." Id. Here, a decade later, Cockle's health care coverage was worth "approximately 20 percent of her monetary compensation." Br. of Appellant at 34. This ongoing trend underscores one of Justice Marshall's strongest arguments, regarding which the Morrison-Knudsen majority conceded, "There is force to this argument," 461 U.S. at 635, 103 S.Ct. 2045, namely, why should injured workers who were receiving more of their earnings in in-kind consideration be given less workers' compensation than those who were receiving a larger share of their earnings as monetary pay? In Justice Marshall's view, that concern was precisely what had prompted the inclusion of the general phrase "reasonable value of board, rent, housing, lodging, or similar advantage received from the employer"the four enumerated benefits being simply early twentieth century examples of "known noncash components of an employee's earning power." Id. at 642, 103 S.Ct. 2045.
Justice Marshall also rejected the notion that the "similar advantage" provision must be construed to include only benefits offered when the 1927 statute was enacted:
Legislative enactments framed in general terms and designed for prospective operation should be construed to apply to subjects falling within their general purview *592 even though coming into existence after their passage. As this Court has recognized:
"Old laws apply to changed situations...."
461 U.S. at 638, 103 S.Ct. 2045 (Marshall, J., dissenting) (quoting Browder v. United States, 312 U.S. 335, 339-40, 61 S.Ct. 599, 85 L.Ed. 862 (1941)).
The Court of Appeals in this case distinguished and rejected what it called the Morrison-Knudsen majority's "misleading analysis," Cockle, 96 Wash.App. at 85, 977 P.2d 668, citing several reasons, including the following one:
The LHWCA, according to the Morrison-Knudsen Court, is "not a simple remedial statute intended for the benefit of the workers." The Washington Act, in stark contrast, "is remedial in nature and should be liberally construed, with doubts resolved in favor of the worker." Its goal is "to insure fair compensation of disabled workers."
Id. at 84, 977 P.2d 668 (footnotes omitted) (quoting Morrison-Knudsen, 461 U.S. at 636, 103 S.Ct. 2045; Double D. Hop Ranch, 133 Wash.2d at 798, 947 P.2d 727; and Kilpatrick, 125 Wash.2d at 230, 883 P.2d 1370). While the Department correctly notes that the Morrison-Knudsen Court was also under a mandate to liberally construe its act, see 461 U.S. at 646, 103 S.Ct. 2045 (Marshall, J., dissenting) (citing Balt. & Phila. Steamboat Co. v. Norton, 284 U.S. 408, 414, 52 S.Ct. 187, 76 L.Ed. 366 (1932)), we believe its application of that principle conflicts with our strong tradition of resolving ambiguities in the worker's favor and of doling out compensation in a way that will "most likely reflect a worker's lost earning capacity." Double D Hop Ranch, 133 Wash.2d at 798, 947 P.2d 727. We therefore likewise decline to follow the Morrison-Knudsen Court's reasoning.[9]
The Department complains that including employer-provided health care coverage in "wages" will make Washington's workers' compensation system costly, burdensome, and time-consuming rather than "prompt, sure [and] certain," a goal we recognized in Weyerhaeuser Co. v. Tri, 117 Wash.2d 128, 138, 814 P.2d 629 (1991). While take-home pay is undoubtedly easier to valuate than benefits like "board, housing, fuel, or other consideration of like nature," the Court of Appeals correctly noted that the Department is not entitled to disregard statutory provisions merely because it finds them administratively inconvenient. 96 Wash.App. at 80 & n. 27, 977 P.2d 668. That said, however, we would reject as unnecessary the Court of Appeals' requirement that the "reasonable value" of a benefit like health care coverage be measured by its hypothetical market value[10] rather than simply by the monthly premium actually paid by an employer to secure itor, in the case of a group plan, the worker's portion thereof.
*593 Finally, the Department warns of a potential "flood of litigation" over which modern work benefits should and should not be included in "wages" in RCW 51.08.178. While the Legislature's current mandate to include "other consideration of like nature" to "board, housing [and] fuel" is ambiguous and by no means easily applied to all in-kind work benefits offered by employers today, we believe the Department's concerns are substantially addressed by proper application of the ejusdem generis rule.
The Court of Appeals correctly rejected the "any and all forms of consideration" standard in Rose v. Dep't of Labor & Indus., 57 Wash.App. 751, 758, 790 P.2d 201, review denied, 115 Wash.2d 1010, 797 P.2d 512 (1990). See Cockle, 96 Wash.App. at 76-77, 977 P.2d 668. Rather, it applied the ejusdem generis rule to arrive at a narrower construction: "It is not hard to discern why the legislature provided that [food, shelter, and heat] shall count as `wages.' ... Each is a necessity of life, without which the injured worker cannot survive[[11]] a period of even temporary disability." 96 Wash.App. at 74, 977 P.2d 668.[12] We would modify that analysis only slightly.
Ambiguous statutory language such as the phrase "other consideration of like nature" in RCW 51.08.178(1) should be construed in the manner "best advanc[ing] the perceived legislative purpose." Wichert v. Cardwell, 117 Wash.2d 148, 151, 812 P.2d 858 (1991). Title 51's overarching objective is "reducing to a minimum the suffering and economic loss arising from injuries and/or death occurring in the course of employment." RCW 51.12.010 (emphasis added). Workers' compensation was intended to be "remedial in nature" and its calculation was changed by the 1971 Legislature to reflect a worker's actual "lost earning capacity." Double D Hop Ranch, 133 Wash.2d at 798, 947 P.2d 727. Also, on a practical level, this court has recognized that the workers' compensation system should continue "serv[ing] the goal of swift and certain relief for injured workers." Tri, 117 Wash.2d at 138, 814 P.2d 629. We therefore construe the statutory *594 phrase "board, housing, fuel, or other consideration of like nature" in RCW 51.08.178(1) to mean readily identifiable and reasonably calculable in-kind components of a worker's lost earning capacity at the time of injury that are critical to protecting workers' basic health and survival.[13] Core, nonfringe benefits such as food, shelter, fuel, and health care all share that "like nature." By contrast, we do not believe injury-caused deprivation of the reasonable value of fringe benefits that are not critical to protecting workers' basic health and survival qualifies as the kind of "suffering" that Title 51 was legislatively designed to remedy. See RCW 51.12.010.

CONCLUSION
We hold that, just as "board, housing [and] fuel" were core, nonfringe benefits critical to protecting the basic health and survival of workers injured in the early 1900s, whose suffering such legislative language was originally designed to reduce, so also were the health care premiums paid by Cockle's employer in exchange for her labor in the late 1900s a nonfringe component of her lost "wages." The value of such premiums should have been included in the RCW 51.08.178 basis used to calculate her workers' compensation payments. We affirm the Court of Appeals, but modify its analysis for the reasons set forth above and reject its method for calculating the "reasonable value" of the benefit in question. We remand to the Department for recalculation of Cockle's compensation in accordance with our decision, and order the Department to pay her reasonable attorney fees pursuant to RCW 51.52.130.
ALEXANDER, C.J., SMITH, JOHNSON, SANDERS, and IRELAND, JJ., concur.
TALMADGE, J.[*] (dissenting).
Washington's Industrial Insurance Act (Act) was first enacted in 1911. Despite the millions of claims presented by injured workers in Washington to the Department of Labor and Industries (Department), the hundreds of thousands of cases heard by the Board of Industrial Insurance Appeals (Board), and the thousands of cases tried in Washington's court system since the passage of the Act in 1911, the majority for the first time interprets the provisions of RCW 51.08.178 as including employer-provided benefits when calculating an injured worker's wages and that worker's time loss, pension, or death benefits under the Act. This position is inconsistent with the express language of the statute and its interpretation by the Department and the Board. The majority's interpretation of the Act will disrupt the Department's underwriting of the risk of industrial accidents and assessment of premiums to employers for industrial insurance. This interpretation of RCW 51.08.178 has no principled limitation; many other types of employer benefits constitute "necessities of life," as the Court of Appeals phrased them, or "core, nonfringe benefits," as the majority provides. Finally, an unintended consequence of the majority's opinion is the likely provocation of a bitter battle in the Legislature between labor and business over the scope of RCW 51.08.178. For these reasons, I respectfully dissent.
(1) RCW 51.08.178 Definition of Wages
Beginning first with the language of RCW 51.08.178, the statute provides:
(1) For the purposes of this title, the monthly wages the worker was receiving from all employment at the time of injury shall be the basis upon which compensation is computed unless otherwise provided specifically in the statute concerned. In cases where the worker's wages are not fixed by the month, they shall be determined by multiplying the daily wage the worker was receiving at the time of the injury:

*595 (a) By five, if the worker was normally employed one day a week;
(b) By nine, if the worker was normally employed two days a week;
(c) By thirteen, if the worker was normally employed three days a week;
(d) By eighteen, if the worker was normally employed four days a week;
(e) By twenty-two, if the worker was normally employed five days a week;
(f) By twenty-six, if the worker was normally employed six days a week;
(g) By thirty, if the worker was normally employed seven days a week.
The term "wages" shall include the reasonable value of board, housing, fuel, or other consideration of like nature received from the employer as part of the contract of hire, but shall not include overtime pay except in cases under subsection (2) of this section. However, tips shall also be considered wages only to the extent such tips are reported to the employer for federal income tax purposes. The daily wage shall be the hourly wage multiplied by the number of hours the worker is normally employed. The number of hours the worker is normally employed shall be determined by the department in a fair and reasonable manner, which may include averaging the number of hours worked per day.
(2) In cases where (a) the worker's employment is exclusively seasonal in nature or (b) the worker's current employment or his or her relation to his or her employment is essentially part-time or intermittent, the monthly wage shall be determined by dividing by twelve the total wages earned, including overtime, from all employment in any twelve successive calendar months preceding the injury which fairly represent the claimant's employment pattern.
(3) If, within the twelve months immediately preceding the injury, the worker has received from the employer at the time of injury a bonus as part of the contract of hire, the average monthly value of such bonus shall be included in determining the worker's monthly wages.
(4) In cases where a wage has not been fixed or cannot be reasonably and fairly determined, the monthly wage shall be computed on the basis of the usual wage paid other employees engaged in like or similar occupations where the wages are fixed.
The majority's analysis focuses solely on the definition of wages found in one portion of the statute to the exclusion of the remainder of RCW 51.08.178. The majority looks to the language of "the reasonable value of board, housing, fuel, or other consideration of like nature received from the employer as part of the contract of hire ...." to sustain its position that medical and dental insurance constitute part of an individual's wages when calculating time loss benefits. The majority also extrapolates from Washington case law to support its position. The majority finds support both in Rose v. Department of Labor & Indus., 57 Wash.App. 751, 758, 790 P.2d 201 (1990), a Court of Appeals' decision suggesting wages include all consideration received by an employee from an employer in exchange for work performed, and in other case law indicating the purpose of time loss compensation is to reflect a worker's lost earning capacity. See, e.g., Double D Hop Ranch v. Sanchez, 133 Wash.2d 793, 798, 947 P.2d 727 (1997). The majority's discussion, however, is far too narrow.
Looking to the language of RCW 51.08.178 itself, it is readily apparent the Legislature nowhere mentions benefits like medical and dental insurance as part of "wages" for purposes of calculating time loss.[1] In RCW 51.08.178, the Legislature explicitly referenced a variety of forms of compensation, but specifically failed to mention benefits. The Legislature included wages, board, housing, fuel, tips, and bonuses, but expressly excluded overtime wages. It did not reference medical and dental insuranceanymore than *596 it discussed deferred compensation contributions, pensions, payments for group life insurance, and many other fringe benefits. The Legislature did reference board, housing, and fuel, benefits which are plainly associated with an employee traveling or living at a place of the employer's choosing because of a particular need of the employer. "[O]ther consideration of a like nature" more rationally fits with these circumstances of a peripatetic employee or one living elsewhere than their usual residence at the employer's request. See, e.g., 1954 Op. Att'y Gen. 240 (University of Washington student nurses residing at Firland Sanitarium during the training period are Firland employees).
Moreover, RCW 51.08.178(1) expressly states the calculation of wages is based on multiplication of the hourly wage paid to an injured worker by the number of hours the worker is normally employed. The statute does not contemplate in any fashion that the hourly wage includes benefits, except for those specific categories of nonwage benefits identified in the statute itself.
Finally, the statute must be placed in context. RCW 51.08.178 is a definitional section. Time loss under the Act is paid pursuant to the provisions of RCW 51.32.090. The calculation of temporary total disability or time loss payments is derived from RCW 51.32.060, which commands that an injured worker be paid a portion of his or her wages. However, the benefits received by an injured worker are capped on the basis of the average monthly wage paid in Washington State. RCW 51.32.060(5). The average daily wage in Washington State is defined in RCW 51.08.018. That statute specifically references the provisions of RCW 50.04.355, Washington's Employment Security Act. Washington's Employment Security Act specifically exempts various fringe benefits from the definition of wages. RCW 50.04.330. It would seem exceedingly anomalous for the Legislature to include benefits within the definition of wages under the Act and yet cap the calculation of wages for purposes of time loss payments by a figure that expressly excludes the payment of such benefits.
The majority asserts the definition of "wages" under the Act is a product of 1971 legislative changes. The majority is correct in part. "Wages" have not been a part of the definition of time loss under the Act since 1911. The definition of "wages" did become more significant after 1971 because amendments to the Act that year created the present statutory scheme for payment of time loss benefits, pension benefits, and death benefits based on a percentage of the wages paid to an injured worker. In 1971, the Act was expanded to cover nearly all employment in Washington rather than only "extra hazardous" work.
But the definition of "wages" has been part of coverage determinations under the Act since its inception. In particular, a person who performed services without the payment of wages constituted a volunteer who was not covered under Washington's Act. See Laws of 1911, ch. 74, § 3, at 348 ("[a]ny individual employer or any member or officer of any corporate employer who shall be carried upon the pay roll at a salary or wage not less than the average salary or wage named in such pay roll and who shall be injured, shall be entitled to the benefit of this act as and under the same circumstances as and subject to the same obligations as a workman"). See also RCW 51.12.035(1) ("[a] `volunteer' shall mean a person who performs any assigned or authorized duties for the state or any agency thereof, ... brought about by one's own free choice, receives no wages, and is registered and accepted as a volunteer by the state or any agency thereof ..."). It is likely this conception of "wages" was imported into RCW 51.08.178 in 1971.
Washington courts and the Office of the Attorney General have discussed the question of receipt of wages for purposes of determining coverage under the Act. In Kirk v. Dep't of Labor & Indus., 192 Wash. 671, 74 P.2d 227 (1937), we held a person who went into the woods with his neighbor on Sunday to assist the neighbor in obtaining firewood for sale without agreeing to specific compensation was not covered under the Act. Similarly, in a long series of Attorney General opinions, the Attorney General has considered the question of whether a person is an *597 employee under the Act or a volunteer. In Attorney General Opinion No. 240, the Office of the Attorney General opined that certain student nurses from the University of Washington who served for a six-week training period at the Firland Sanitarium were employees under the Act, even though they remained students and did not receive a definite wage. Instead, the student nurses received room, board, and fuel as remuneration for their services. It is precisely the circumstances of employees such as the student nurses at Firland Sanitarium that the provisions in RCW 51.08.178 with respect to room, board and other similar types of compensation were designed to address as to eligibility for coverage under the Act. But at no time, however, did the Legislature contemplate benefits would be part of the calculation of wages under RCW 51.08.178 for purposes of establishing a worker's benefits under the Act.
(2) Department/Board Interpretation of RCW 51.08.178
Neither the Department nor the Board has ever interpreted the statute in the way the majority does today. Certainly from 1971 to the present, the Department has handled millions of injured worker claims. Similarly, since 1971, the Board has heard hundreds of thousands of industrial insurance appeals involving injured workers. However, neither agency has ever taken the view that benefits are part of the calculation of wages under RCW 51.08.178. To the contrary, the language utilized by the majority has never been interpreted to include benefits such as medical or dental insurance by either one of the administrative agencies with substantial expertise in Washington's unique Act. Under our case law, we give substantial deference to administrative agencies entrusted with the interpretation of specialized statutory enactments. See Doe v. Boeing Co., 121 Wash.2d 8, 15, 846 P.2d 531 (1993); Superior Asphalt & Concrete v. Dep't of Labor & Indus., 84 Wash.App. 401, 405, 929 P.2d 1120 (1996). Plainly, the Act is just such a specialized statutory enactment. The Department, in its capacity as administrator of Washington's industrial insurance fund, as well as the regulator of self-insured employers, chapter 51.14 RCW, has definitive expertise in interpreting the Act. Similarly, the Board, as a representative of both labor and management, RCW 51.52.010, has considerable expertise in industrial insurance law. Thus, we should give deference to the interpretation of the provisions of RCW 51.08.178 by these entities.
The Department underwrites industrial insurance premiums by employer classification for employers subject to the state fund. RCW 51.16.035. At no time in the Department's underwriting of the risk for Washington employers did the Department take into consideration the possibility wages to be paid to injured workers might include medical and dental insurance and untold other fringe benefits. Consequently, it is clear premiums will be significantly increased[2] in order for state fund employers to accommodate the increase in payouts for past and present injured workers, necessitated by the majority's opinion.[3]
*598 (3) Practical Implications of the Majority's Policy-making
There is no principled limitation on the scope of the majority's interpretation of RCW 51.08.178. In oral argument, counsel for Ms. Cockle took the intellectually honest view of RCW 51.08.178 by arguing that wages constitute any consideration received by an employee. This is consistent with the Court of Appeals language from Rose. While I disagree with these interpretations, they indicate a profound problem with the majority's analysis.
The majority essentially adopts the Court of Appeals view that the language of RCW 51.08.178 relating to "other consideration of like nature received from the employer as part of the contract of hire" means "necessities of life." Majority at 593. The majority instead articulates its view that wages for purposes of time loss include "readily identifiable and reasonably calculable in-kind components of a worker's lost earning capacity at the time of injury that are critical to protecting workers' basic health and survival." Id. at 594-595. These so-called "core, nonfringe benefits," as the majority describes them, cannot be found in the language of RCW 51.08.178.
Moreover, the majority offers very little guidance to the Department or self-insured employers as to what its policy for the scope of benefits under the Act will mean in the real world. Plainly, employers offer numerous types of benefits to employees as inducements or consideration for employment. Such benefits might include life insurance benefits, stock option plans, deferred compensation plans, profit sharing plans, social security contributions, unemployment compensation contributions, dependant care assistance plans, group legal services plans, interest free or low interest loan programs, savings plans, 401(k) matching plans, sick leave benefits, vacation benefits, death and disability benefits, charitable contributions matching programs, employer-funded scholarships and fellowships, tuition waivers, and alcohol and drug rehabilitation programs, just to name a few. How can this court, divorced from the reality of modern workplace compensation and the give and take of labor-management negotiations, determine what would be "core" to the well-being of a particular injured worker? Certainly, for an older injured worker approaching retirement age, deferred compensation plans and pension benefits might well constitute a "core benefit." For a younger employee, vacation benefits, as Ms. Cockle originally argued, or tuition assistance programs for children in higher education, might equally be a core benefit.
Additionally, the majority implies its analysis of RCW 51.08.178 for time loss benefits might not apply to pensions or death benefits under the Act. Majority op. at 593.[4] By its terms, RCW 51.32.060 sets forth the mechanism for payment of time loss benefits. RCW 51.32.090. That statute utilizes the definition of wages in RCW 51.08.178. Similarly, pension benefits, RCW 51.32.010, or death benefits, RCW 51.32.050, utilize the framework of RCW 51.32.060 and RCW 51.08.178. The majority cannot limit its policy-making on the definition of wages to time loss benefits only, as the statutes offer no basis whatsoever for distinguishing between time loss, pension, or death benefits under the Act.
Finally, in other American jurisdictions, benefits have not been included in the calculation of wages in most worker compensation statutes. For example, in Morrison-Knudsen Constr. Co. v. Dir., Office of Workers' Comp. Programs, 461 U.S. 624, 103 S.Ct. 2045, 76 L.Ed.2d 194 (1983), the United States Supreme Court rejected the view that employer-funded health and welfare benefits must be included when calculating an injured worker's wage replacement benefits under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901. The employer's position was argued by Professor Arthur Larson, whose treatise on worker's compensation *599 law, 5 Arthur Larson & Lex K. Larson, Larson's Worker's Compensation Law § 93.01[1][a], [b] (2000), also reflects this view. See also Tabor v. Levi Strauss & Co., 33 Ark.App. 71, 801 S.W.2d 311 (1990) (excluding health and welfare benefits from statutorily defined term "wages" similar to definition provided in RCW 51.08.178, because benefits are not "money wages" or similar to room and board); see Rainey v. Mills, 733 S.W.2d 756 (Ky.Ct.App.1987) (excluding pension plan contributions, health insurance benefits, and life insurance premiums from defined term "wages," similar to that in RCW 51.08.178, because those benefits are not similar to board, rent, housing, and lodging); see Antillon v. N.M. State Highway Dep't, 113 N.M. 2, 820 P.2d 436 (Ct.App.1991) (holding retirement benefits and group insurance are not "similar advantages" to lodging and meals provided by employer under statutory definition of "wages" similar to that provided in RCW 51.08.178).
As the only member of this court to have served as a member of the Washington State Legislature, I am acutely aware of the types of battles engendered by controversies between labor and business over industrial insurance. I served in the Legislature when that body confronted worker compensation issues such as three-way industrial insurance (allowing private insurers to write industrial insurance coverage), the schedule of permanent partial disability benefits, rehabilitative services for injured workers, and complaints from the business community regarding premiums charged by the Department. These issues are bruising in nature. The majority's decision will provoke an immediate and bitter struggle in the Legislature to address the definition of wages under RCW 51.08.178.[5]
I am sympathetic to the needs of injured workers in Washington. As a legislator, my record reflected that concern. I am unconvinced the benefits paid to injured workers under RCW 51.32.060 or the schedule of permanent partial disability awards adequately compensate injured workers. But this does not mean I am free as a member of this court to make expansive new industrial insurance policy in the guise of statutory interpretation. A decision to alter the basis for calculating wages under the Act is precisely the kind of decision the Legislature needs to make because the Legislature can hear from all parties with a stake in this controversy; it can balance the interest of employers in a stable premium obligation against the needs of workers who should be compensated for their injuries. The give and take of the legislative process can take its appropriate course.
As of now, however, benefits such as medical and dental insurance are not within the definition of wages under RCW 51.08.178. I would reverse the decision of the Court of Appeals and the trial court in this case, and reinstate the decisions of the Department and the Board.
GUY, J.[*] (concurring in dissent).
I agree with the result and with most of the reasoning of the dissent. I write only to emphasize that when the Legislature enacted the language of RCW 51.08.178 in 1971, health insurance was a well-known and well-recognized form of compensation. By not including health insurance coverage in its *600 definition of wages in RCW 51.08.178, the Legislature intentionally excluded it. Moreover, given the Department of Labor and Industries' exclusion of health insurance coverage in its calculation of wages, the Legislature has had ample opportunity to clarify the statute if it felt that the Department was misinterpreting it.
This case turns upon the interpretation of the definition of "wages": "The term `wages' shall include the reasonable value of board, housing, fuel, or other consideration of like nature received from the employer as part of the contract of hire, but shall not include overtime pay except in cases under subsection (2) of this section." RCW 51.08.178(1). The issue is whether health care premiums are a form of "other consideration of like nature."
The dissent makes it appear as if the definition in question were not enacted into law in 1971, but instead in 1911. See Dissent at 594, 596-597. The majority stresses the early 20th century origins of the phrase "`board, housing, [and] fuel'" when it finds that language from the early 1900s should be read to imply that comparable benefits in the late 1900s would include health care coverage. See Majority at 594. But regardless of the origins of the wording, the definition of "wages," which is at issue in this case, was enacted in 1971. See Laws of 1971, 1st Ex.Sess., ch. 289, § 14. The fact that this language became law in 1971 rather than in the early 20th century is important because this fact affects how we interpret the phrase "other consideration of like nature." If we conceive of the phrase as having entered into state law in the early part of the last century, we might argue, as the majority does, that the phrase was meant to cover essential employment benefits, which at that time included board, housing, and fuel; since health insurance has now become an essential employment benefit, "other consideration of like nature" should be extended to include the payment of health insurance premiums. But because RCW 51.08.178 was actually enacted in 1971, the listing of only board, housing, and fuel as benefits which count as wages indicates "other consideration of like nature" should be construed narrowly. Since RCW 51.08.178 was enacted at a time in which health insurance had become a significant fringe benefit, we may assume that it was considered and rejected for express mention in that statute. In 1911, health care insurance would not have been recognized as a fringe benefit because it was not until 1929 and the years following that modern health insurance plans took shape. See RASHI FEIN, MEDICAL CARE, MEDICAL COSTS: THE SEARCH FOR A HEALTH INSURANCE POLICY 10-12 (1986); ODIN W. ANDERSON, BLUE CROSS SINCE 1929: ACCOUNTABILITY AND THE PUBLIC TRUST 18 (1975). In 1927, when the Longshore and Harbor Workers' Compensation Act (33 U.S.C. § 901) was enacted, employer-funded fringe benefits were virtually unknown. Morrison-Knudsen Constr. Co. v. Director, Office of Workers' Compensation Programs, 461 U.S. 624, 632, 103 S.Ct. 2045, 76 L.Ed.2d 194 (1983). By 1951, however, 77 million people were covered by health insurance. FEIN, MEDICAL CARE, MEDICAL COSTS at 23. The Court of Appeals in Cockle v. Dep't of Labor & Indus., 96 Wash.App. 69, 84, 977 P.2d 668 (1999), observes that "the Washington legislature enacted RCW 51.08.178 in 1971, and by then employer-supplied health insurance was a common way of augmenting monetary compensation."
Because, as we have seen, health or medical insurance was a significant form of fringe benefit in 1971, the Legislature's failure to list it expressly indicates the Legislature did not consider it to be "wages." It is unlikely that the Legislature would relegate such an important kind of fringe benefit to the category of "other consideration of like nature."
The majority itself raises a related criticism of its position: that the Legislature left the language of RCW 51.08.178 unaltered despite the Department's interpretation of the provision as excluding employer-provided benefits such as health care coverage from its computation of workers' compensation. Majority at 587. Where the Legislature fails to act in such a situation, the interpretation of the Department is given even greater weight:
"`Where a statute is ambiguous, construction placed upon it by the officer or department charged with its administration is not *601 binding on the courts but is entitled to considerable weight in determining the legislative intention, and the persuasive force of such interpretation is strengthened when the legislature, by its failure to amend or by amending some other particular without repudiating the administrative construction, silently acquiesces in the administrative interpretation. White v. State, 49 Wash.2d 716, 306 P.2d 230 [1957].'"
Seattle-King County Council of Camp Fire v. Dep't of Revenue, 105 Wash.2d 55, 66, 711 P.2d 300 (1985) (quoting Hart v. Peoples Nat'l Bank, 91 Wash.2d 197, 201, 588 P.2d 204 (1978) (quoting Bradley v. Dep't of Labor & Indus., 52 Wash.2d 780, 786-87, 329 P.2d 196 (1958))). Although the majority counters the first part of this argument by asserting that an agency's interpretation is not binding on this court, it does not respond at all to the second part concerning the acquiescence of the Legislature. The decision to count health insurance premiums as wages should be the Legislature's, not the judiciary's. Since the Legislature has not seen fit to expressly include health care coverage as wages, this court should not interpret the statute as implying such an inclusion.
The leading treatise on workers' compensation law warns courts against construing "wages" too broadly and making the same mistake as the federal Court of Appeals in Hilyer v. Morrison-Knudsen Constr. Co., 670 F.2d 208 (D.C.Cir.1981), the decision reversed by the United States Supreme Court in Morrison-Knudsen:
A general observation is in order here. Workers' compensation has been in force in the United States for over seventy years, and fringe benefits have been a common feature of American industrial life for most of that period. Millions of compensation benefits have been paid during this time. Whether paid voluntarily or in contested and adjudicated cases, they have always begun with a wage basis calculation that made "wage" mean the "wages" that the worker lives on and not miscellaneous "values" that may or may not someday have a value to him or her depending on a number of uncontrollable contingencies.
Before a single court takes it on itself to say, "We now tell you that, although you didn't know it, you have all been wrongly calculating wage basis in these millions of cases, and so now, after seventy years, we are pleased to announce that we have discovered the true meaning of `wage' that somehow eluded the rest of you for seven decades," that court would do well to undertake a much more penetrating analysis than is visible in the Circuit Court's opinion in Hilyer of why this revelation was denied to everyone else for so long.
5 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 93.01[2][b] (2000).
I respectfully concur in the dissent.
MADSEN, J., concurs.
NOTES
[1] The written employment contract also provided vacation pay, but that issue, litigated below, was not appealed and is not before us.
[2] Since the question before us is which in-kind forms of consideration "received from the employer as part of the contract of hire" are "of like nature" to board, housing and fuel, we need not cite those portions of Title 51's "wages" definition relating to monetary forms of consideration such as an hourly or daily pay rate, as the dissent urges. See Dissent at 595-596. The dissent also argues, "RCW 51.08.178(1) expressly states the calculation of wages is based on multiplication of the hourly wage paid to an injured worker by the number of hours the worker is normally employed. The statute does not contemplate in any fashion that the hourly wage includes benefits, except for those specific categories of nonwage benefits identified in the statute itself." Id. at 596. This remark fails to recognize that the Legislature did not make "the number of hours normally employed" in any way a factor in determining the "reasonable value" of in-kind consideration such as "board, housing [and] fuel," but did expressly mandate that all "other consideration of like nature" be included in calculating "wages." RCW 51.08.178.
[3] The statute's examples of in-kind employment consideration to be included in the calculation of "wages"board, housing, fuelwere copied verbatim from boilerplate language used in workers' compensation acts going back to the early 1900s. See, e.g., Morrison-Knudsen Constr. Co. v. Dir., Office of Workers' Comp. Programs, 461 U.S. 624, 629, 103 S.Ct. 2045, 76 L.Ed.2d 194 (1983) (construing a 1927 act). Whether or not health care was a prevalent employment benefit in 1971, when RCW 51.08.178 was enacted, is thus immaterial. Cf. Concurrence in Dissent (Guy, C.J.) at 595.
[4] Chief Justice Guy contends, "By not including health insurance coverage in its definition of wages in RCW 51.08.178, the Legislature intentionally excluded it." Concurrence in Dissent (Guy, C.J.) at 594. Such an argument would be persuasive had the Legislature enumerated all qualifying benefits, but it did not. The dissenting opinions fundamentally ignore the Legislature's express mandate that the "reasonable value" of all "consideration of like nature received from the employer as part of the contract of hire" be included in the calculation of every injured worker's "wages." RCW 51.08.178.
[5] See generally RCW 62A.3-303(b) ("`Consideration' means any consideration sufficient to support a simple contract.") and RCW 19.09.020(3) ("`Compensation' means salaries, wages, fees, commissions, or any other remuneration or valuable consideration[.]").
[6] We, too, read RCW 51.32.090(6) to mean that, to the extent employer-provided "wages"whether in the form of money, fu, or health care coverageare continued during temporary total disability, time-loss compensation is reduced accordingly. Title 51 was intended to "reduc[e] to a minimum" an injured worker's "economic loss." RCW 51.12.010. Logically, any portion of "wages" that injured workers continue to enjoy during their disability period is not part of their "economic loss."
[7] The Department identifies workers' compensation cases from 14 states adopting the Morrison-Knudsen Court's reasoning. Several of them, though, involved statutes markedly different from our own. A few "wage" definitions lacked any broad language comparable to "other consideration of like nature," one had a closed, itemized list, one had had its broad language pointedly deleted by the legislature, and one expressly excluded "board, lodging or similar advantage."
[8] In his treatise, Larson argued, as he did before the United States Supreme Court, that "wages" should include "not only wages and salary but any thing of value received as consideration for the work, as, for example, tips, bonuses, commissions and room and board, constituting real economic gain to the employee .... `wages' that the worker lives on and not miscellaneous `values' that may or may not someday have a value to him or her depending on a number of uncontrollable contingencies...." 5 Arthur Larson & Lex K. Larson, LARSON'S WORKERS' COMPENSATION LAW § 93.01 [2][a], [b] (2000) (footnotes omitted) (emphasis added). Cockle argues that, even under Larson's analytical criteria, her health care coverage should be included in "wages," since it provided valuable present peace of mind and clearly qualified as "real economic gain."
[9] Courts in other jurisdictions have reached similar conclusions. See Ex Parte Murray, 490 So.2d 1238, 1240-41 (Ala.1986) (criticizing and distinguishing Morrison-Knudsen, finding Larson's arguments "unpersuasive," and citing Justice Marshall's dissent with approval); Ragland v. Morrison-Knudsen Co., 724 P.2d 519, 521 (Alaska.1986) (same); Meeker v. Provenant Health Partners, 929 P.2d 26, 29 (Colo.App.1996) (same) ("[T]he Morrison-Knudsen conclusion is not binding upon us."); Ashby v. Rust Eng'g Co., 559 A.2d 774 (Me.1989) (distinguishing Morrison-Knudsen.)
[10] Although the parties stipulated in this case that the employer-paid health care premiums fairly reflected the benefit?s value, the Court of Appeals wrote:

A person charged with ascertaining the reasonable value of board, housing and fuel must examine all pertinent factors to determine what the hypothetical objective buyer would pay the hypothetical objective seller on the open market. A person charged with ascertaining the reasonable value of health insurance must do the same.
Cockle, 96 Wash.App. at 78, 977 P.2d 668 (footnote omitted). The Department warns that adding the hypothetical replacement cost of health care coverage to workers' compensation rates in this state would be prohibitively expensive and require "lengthy investigation and consultation of experts." See Suppl. Br. of Pet. at 16, 18, App. E. We agree with Justice Marshall that "[w]hile an employer's contribution may understate the true value of the benefits received ..., it nonetheless provides a readily identifiable and therefore reasonable surrogate for the "advantage" received ... [and] has long been accepted as a reasonable measure of the value of fringe benefits ...." Morrison-Knudsen, 461 U.S. at 642-43, 103 S.Ct. 2045 (Marshall, J., dissenting).
[11] The Department notes that "a significant part of the population of this country does not have health insurance," then asks, "How can Division Two say this is a benefit that one `must replace' when so many go without it?" Pet. for Review at 16. Actually, there are workers in this state who survive even without adequate "board, housing [and] fuel." But the language of RCW 51.08.178(1) suggests the Legislature intended "wages" to include the reasonable value of all core, nonfringe benefits critical to protecting workers' basic health as well as their survival. Title 51 clearly was not enacted merely to prevent starvation, homelessness and "destitution," a standard advocated elsewhere. See 1 Arthur Larson & Lex K. Larson, LARSON'S WORKERS' COMPENSATION LAW § 1.03[5] (2000); cf. RCW 51.12.010."
[12] That specific choice of language prompted the Department to accuse the Court of Appeals' analysis of being "fundamentally flawed," because it "is grounded in significant part in a false assumption that RCW 51.08.178 governs only temporary disability benefits." Suppl. Br. of Pet. at 3. It is certainly true that Title 51's "wages" definition governs calculation not only of time-loss and loss of earning power compensation, but also of permanent total disability compensation, RCW 51.32.060, and compensation to the "family or dependents in case of death of the worker." RCW 51.32.010; see also RCW 51.32.050. However, it should be noted that both the Department and the dissent propose ejusdem generis criteria vulnerable to the same criticism leveled against the Court of Appeals. The Department argues that health care coverage differs from "board, housing [and] fuel" in that "the employer generally provides [the latter benefits] to make the worker more readily accessible to work, or as a special incentive." Suppl. Br. of Pet. at 7. Of course, if a worker is permanently disabled or killed on the job, no amount of "board, housing [and] fuel" would improve his or her work accessibility or motivate better job performance, and yet RCW 51.08.178 would still require that compensation include the "reasonable value" of those benefits. The Department also argues that, in contrast to health care, "consumption of board, room, and fuel occurs on a daily basis." Suppl. Br. of Pet. at 7. Of course, any injury-caused death would abruptly terminate the "daily" nature of such consumption. For its part, the dissent characterizes "board, housing [and] fuel" as "benefits which are plainly associated with an employee traveling or living at a place of the employer's choosing because of a particular need of the employer." Dissent at 595-596. Typically, though, when work injuries result in death, employees no longer travel or live at a place of the employer's choosing. Clearly, all of the above ejusdem generis criteria are vulnerable to the Department's charge of being "grounded in significant part in a false assumption" that RCW 51.08.178 does not govern compensation in cases of permanent disability or death. Suppl. Br. of Pet. at 3.
[13] This is not a subjective determination. Cf. Dissent at 597-598. Health care coverage is "of like nature" to "board, housing [and] fuel" because, like those employment benefits, it is objectively critical to protecting the basic health and survival of virtually all workers.
[*] Justice Philip Talmadge is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. IV, § 2(a) (amend. 38).
[1] I agree with Chief Justice Guy's observation in his concurrence in the dissent that in 1971 the Legislature could readily have chosen to recognize the phenomenon of compensating modern workers by paying for their medical and dental plans by adding such compensation to the definition of wages in RCW 51.08.178. The Legislature did not do so then and has not done so since that time.
[2] To accommodate the cost of impact of the majority's analysis adding health insurance benefits to the wage calculation of RCW 51.08.178, the Department estimated a premium impact of more than five percent to employers. App. to State's Pet. for Review. This estimate is obviously rough as it may not include the impact on pension and death benefits or the cost impact of other fringe benefits necessary to the well-being of workers.
[3] Part of the rationale for the majority opinion is the majority's stated concern about health benefits for injured workers. Majority at 589. But the Legislature addressed this question in RCW 51.32.090(4)(c) (worker's health insurance benefits restored to injured worker who returns to work in capacity other than usual job). Ironically, when House Bill 1246 was enacted in 1993, a representative of the Washington State Labor Council specifically testified benefits were not part of time loss compensation ("worker comp typically doesn't talk about benefits. Benefits are not a portion of the time loss calculation." Testimony of Jeff Johnson before House Committee on Commerce and Labor, Response Br. by Pet'r (Feb. 16, 1993) at A). Moreover, the Department administers not only the accident fund but also the medical aid fund. RCW 51.04.030. Workers injured on the job are not deprived of medical coverage. Workers and employers pay 50 percent each for the premium contributed to the medical aid fund. RCW 51.16.140(1). Injured workers are entitled to medical coverage for injuries sustained on the job. RCW 51.32.010. The majority makes no mention of the medical aid fund or its implication for injured workers such as Dianne Cockle.
[4] The majority attempts to explain its view on "wages" for purposes of time loss on the one hand and pensions and death benefits on the other. Majority op. at 593 n. 12. But a casual reader of that footnote is still left without a clear standard as to whether the majority's "core, nonfringe benefits" are or are not recoverable when a worker or the worker's beneficiary receives a pension or death benefits.
[5] In virtually every jurisdiction where the definition of wages has been expanded by judicial decision, legislative involvement has followed, narrowing the scope of such a judicial interpretation. See Ragland v. Morrison-Knudsen Co., 724 P.2d 519, 521 (Alaska 1986) (holding that health and welfare benefits could be viewed as "money rate" of compensation) (noting that Alaska legislature revised the statute to exclude medical benefits from "wages" during litigation of this case in former Alaska Stat. § 23.30.265(15) (1983)); See Ciampi v. Hannaford Bros. Co., 681 A.2d 4, 9 (Me.1996) (noting Maine legislature acted to amend statute to restrict the fringe benefits included in wages after the court held that health and welfare benefits constituted "wages, earnings, or salary"); see Murphy v. Ampex Corp., 703 P.2d 632, 633-34 (Colo.App.1985) (holding health and welfare benefits are analogous to board and rent) (the legislature acted to limit fringe benefit coverage to those expressly enumerated in Colo.Stat. § 8-40-201(19)(b) (1999)). Once such a bitter struggle is provoked in the legislative process, it is almost impossible to predict what kind of damage can be done to the interests of the injured workers of Washington or the state's business community.
[*] Justice Richard P. Guy is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. IV, § 2(a) (amend. 38).