120 P.3d 564 (2005)
155 Wash.2d 470
Paula K. GALLO, Petitioner,
v.
DEPARTMENT OF LABOR AND INDUSTRIES, Respondent,
Kenneth Barber, Fred Jones, and Daniel Renshaw, Appellants,
v.
Department of Labor and Industries, Respondent, and
James A. Dumont, Appellant,
v.
Supervalu, Inc., and Department of Labor and Industries, Respondents.
Nos. 74849-7, 75064-5, 75070-0, 75071-8, 75088-2.
Supreme Court of Washington, En Banc.
Argued November 16, 2004.
Decided September 29, 2005.
*565 Terry James Barnett, Rumbaugh Rideout & Barnett, Tacoma, Robert Charles Milhem, Spokane, for Petitioner.
John R. Wasberg, Office of the Attorney General, Amy L. Arvidson, Keehn Arvidson PLLC, Seattle, for Respondents.
Kristopher Ian Tefft, Association of Washington Business, Olympia, for Amicus Curiae Associated General Contractors of Washington, Association of Washington Business, Washington State Farm Bureau.
Lisa Daeley Kelley, Tacoma, Laura Therese Morse, Lane Powell PC, Seattle, for Amicus Curiae Washington Self-Insurers Association.
*566 MADSEN, J.
¶ 1 In these five consolidated cases, the Department of Labor and Industries (Department) issued orders excluding employer contributions to retirement trust funds, apprenticeship training trust funds, the Laborers-Employers Cooperation and Education Trust (LECET), and life insurance and disability insurance trust funds made pursuant to the collective bargaining agreements from its time-loss compensation calculations because it ruled that the payments did not constitute "wages" as defined in RCW 51.08.178(1) and Cockle v. Department of Labor & Industries, 142 Wash.2d 801, 16 P.3d 583 (2001). We hold that these contributions must be analyzed under the test set forth in Cockle for determining whether they constitute "other consideration of like nature" and are thus a part of wages. Further, we hold that the contributions in these cases do not constitute "wages." We affirm the Court of Appeals in Gallo v. Department of Labor & Industries, 119 Wash.App. 49, 81 P.3d 869 (2003) and the superior court decisions in Renshaw, Barber, Jones, and Dumont.

STATEMENT OF CASE
¶ 2 In each of these five consolidated cases the workers suffered an industrial injury while acting in the course of employment pursuant to a collective bargaining agreement (CBA). The facts relevant to each worker are set out below.

Gallo
¶ 3 On August 29, 1997, Paula K. Gallo was injured in the course of her employment with Murphy Brothers, Inc. Gallo's employment was subject to the terms of the International Union of Operating Engineers' CBA. "Schedule A" of the CBA stated Gallo's base wage as $18.10 per hour. Certified Appeal Board Record (CABR Gallo) ex. 1, at 19-25; Clerk's Papers (CP) at 60; CABR (Gallo) at 15-16. The same schedule also classified health and security, pension, and apprentice training as "fringe benefits." CABR (Gallo) ex. 1, at 24. For every compensable hour that Gallo worked, Schedule B of the CBA required Murphy Brothers to pay $2.55 into the health and security trust fund, $2.50 into the pension trust fund, and $.30 to the apprentice and training trust fund.
¶ 4 In late 1997, Gallo was granted benefits. The monthly wage order did not include the value of employer contributions for pensions, health, and security or apprenticeship and training benefits. Gallo appealed to the Board of Industrial Insurance Appeals. For purposes of computing Gallo's time-loss compensation and loss of earnings power pursuant to RCW 51.08.178, the Board's industrial appeals judge (IAJ) included Gallo's medical insurance benefits as wages but excluded contributions for pension and apprenticeship training. The IAJ reasoned that Gallo's medical insurance was a "core benefit of like nature to food, shelter, and fuel." CABR (Gallo) at 29-30. However, because Gallo's pension benefit and apprentice-program-contribution benefit were not similarly critical, the IAJ reasoned they were "fringe benefit[s]." Id. Gallo petitioned for review to the Board, which adopted the IAJ's order.
¶ 5 Gallo then appealed to the superior court, which affirmed the Board. The Court of Appeals also affirmed. Gallo, 119 Wash.App. 49, 81 P.3d 869. Gallo subsequently sought review in this court and her petition was consolidated with four other cases.[1]

Renshaw
¶ 6 On September 27, 2001, Daniel A. Renshaw was injured while working as a full time union apprentice laborer for J.R. Hayes & Sons, Inc., under a CBA between the Washington Northern Idaho District Counsel of Laborers and the Associated General Contractors.
¶ 7 Under the CBA, Renshaw's wage rate was $16.74 per hour. The CBA also required Renshaw's employer to make after-tax deductions from his net pay and remit them to the following: $1.00 per hour worked to a credit union savings account, $.55 per hour worked to the union for union dues, and $.04 *567 per hour worked to the Northwest Fair Contracting Industry Improvement Committee (NWFCA). For every hour Renshaw worked, Schedule B of the CBA required his employer to contribute $3.10 to the health and security trust fund, $2.40 to the pension trust fund, $.25 to the training trust fund, and $.05 to the LECET account (for management-labor promotion).[2] The CBA categorized the health and security contributions and the pension, apprenticeship/training and LECET payments as "fringe benefits." Certified Appeal Board Record (CABR Renshaw) ex. 1, at 25; ex. 2.
¶ 8 Renshaw was granted benefits but disagreed with the Department's calculation of his monthly wage for purposes of computing his time-loss compensation and appealed. The IAJ found that Renshaw's wage included "$18.33/hour ($16.74 in take home pay, $1 for vacation, $.04 for NWFCA and $.55 for union dues)." CABR (Renshaw) at 57. The IAJ also concluded that monthly payments into the union trust funds for health, dental, and vision insurance were part of Renshaw's wage pursuant to RCW 51.08.178 because those benefits were critical to Renshaw's health and survival. However, the IAJ excluded payments for pension, sick pay, life insurance, training, and LECET pursuant to this court's ruling in Cockle, 142 Wash.2d 801, 16 P.3d 583.
¶ 9 Renshaw petitioned for review to the Board, which adopted the IAJ's order. He then appealed to the superior court, which ruled for the Department. Renshaw then filed an appeal in the Court of Appeals and this case was consolidated with four others.

Barber
¶ 10 Kenneth J. Barber was injured on June 5, 2000, while in the course of his employment with Hensons Masonry, Inc., as a full time journeyman hod carrier.[3] At the time of injury, Barber was a member of the same union as Renshaw and subject to the same CBA. Under that agreement Barber's wage rate was $23.40 per hour. Barber was granted benefits but disagreed with the Department's calculation of his monthly wage and he appealed.
¶ 11 The IAJ found that the monthly payments by Barber's employer for health and security benefits constituted a portion of his wages for the purposes of computing his rate of time-loss compensation because these benefits were critical to Barber's health and survival. However, applying the Cockle test the IAJ declined to include the employer's payments into union trust funds for life insurance, disability insurance, pension benefits, training benefits and LECET as part of wages.
¶ 12 Barber petitioned for review to the Board, which adopted the IAJ's order in a split decision. Barber then appealed to the superior court. The court reversed the Board's exclusion of payments for life and disability insurance, but otherwise affirmed the Board.[4] Barber's motion for direct review in this court was granted and his case was consolidated with four others.

Jones
¶ 13 On October 18, 2001, Fred L. Jones was injured while working as a union carpenter for Swinerton Builders on a public works project. At the time, Swinerton employed Jones under a CBA between Jones's union, The Pacific Northwest Regional Council of the United Brotherhood of Carpenters & Joiners of America, and the Oregon-Columbia Chapter of The Associated General Contractors of America, an employer bargaining *568 group of which Swinerton was a member.
¶ 14 Under the CBA, Jones's base wage was $23.78 per hour. His taxable wage was $26.03.[5] For every hour Jones worked, the CBA required Swinerton to deposit into union trust accounts $1.25 for vacation, $1.00 for union dues, $3.28 for health and welfare (health insurance, life insurance, and death and dismemberment insurance), $3.81 for pension, and $.40 for apprenticeship training. Jones's gross wage was $33.52, which met the prevailing wage requirement for public works projects at the time.
¶ 15 Jones was granted benefits but he disputed the Department's calculation of his monthly wage for purposes of determining his time-loss compensation and appealed to the Board. The IAJ reversed and remanded with instructions to recalculate Jones's time-loss compensation based on his marital status, the number of hours worked, and to include his employer-paid health insurance. The IAJ concluded that the payments Jones's employer made into the union trust funds for health, dental, and vision insurance constituted a portion of Jones's wages for the purposes of computing time-loss benefits because those benefits were critical to the worker's health and survival. The IAJ excluded the employer's payments for pension, death and dismemberment, sick pay, life insurance, and training, however, because these benefits did not meet the Cockle test.
¶ 16 Jones petitioned for review but the Board found that Jones's health and welfare benefits (including employer contributions for health care, life insurance, and death and dismemberment insurance) should be excluded in the calculation of his "wages" because he had not lost the coverage during the relevant disability period. Certified Appeal Board Record (CABR Jones) at 4, 8. The Board also ruled that the value of Jones's union dues and training benefits were not properly included in the calculation of his "wages" because they were not critical to his basic health and survival. Id. The Board did rule that the value of Jones's vacation benefit was properly included in the calculation of his "wages" as contemplated by RCW 51.08.178 because he could use these funds as he pleased at any time.[6] CABR (Jones) at 2, 3, 8. The Board rejected Jones's claim that because prevailing wage can be satisfied through combined cash and in-kind benefits, his hourly wage should be based on the prevailing wage. The Board found this argument without merit because RCW 51.08.178(1), and the court's construction of the statutory term "wages," controls the calculation of an injured worker's hourly rate. CABR (Jones) at 2, 8. Finally, the Board ruled that the value of Jones's pension benefits should not be included in the calculation of his "wages" because they are not of like nature to benefits such as food, shelter, fuel, and health care, and because he was not vested in his pension plan and had no entitlement to these benefits. CABR (Jones) at 4, 7-8. The Board reversed the Department and remanded with directions to recalculate Jones's time-loss compensation. Jones then appealed and the superior court affirmed the Board. His subsequent appeal was consolidated.

Dumont
¶ 17 James A. Dumont was injured on June 23, 1999, while working as a truck driver for Supervalu West Coast Grocery, a self-insured employer. At the time of his injury, Dumont was a member of Teamsters Local 313, which had in effect a CBA with Supervalu. Under Schedule A of the CBA with Supervalu, Dumont's wage rate was $19.14 per hour. When Dumont worked the third shift, he was to be paid an additional $.325 per hour worked. The CBA also required Supervalu to deposit into union trust accounts for Dumont $342.55 per month for health insurance,[7] $81.75 per month for dental *569 insurance, $11.35 per month for vision insurance, $39.85 per month for a continuation of health coverage for Dumont and his wife after retirement, and $2.69 per month for pension (with a maximum of $465.37 per month).
¶ 18 After his injury, Dumont was granted benefits but disagreed with the Department's time-loss calculation and appealed. The IAJ found that at the time of his injury, Dumont was paid $19.465 per hour ($19.14 + $.325). The IAJ also found that the monthly payments by Supervalu for Dumont's health, dental, and vision insurance would normally constitute a portion of his wages for purposes of computing his time-loss and loss of earning power computation, but in this case those benefits had continued throughout the period Dumont received time-loss or loss of earning power compensation. The IAJ also found that payments for Dumont's retirement, disability, and life insurance did not constitute part of his wages because they were not critical to protecting Dumont's basic health and survival. The IAJ remanded with directions to the Department to recalculate Dumont's time-loss compensation.
¶ 19 Dumont then petitioned to the Board for review, which adopted the IAJ's order. He then appealed to superior court, which reversed and remanded to the Board for further hearings. The parties again appealed. The superior court ruled, in relevant part, that although Supervalu's payments into the union trust funds for Dumont's medical, dental, and vision protection constituted "wages" because they are critical to protecting a worker's basic health and survival, here the coverage continued through a combination of "paid eligibility" and "waiver of premium," both of which were funded by Supervalu during a portion of his disability period, and therefore the payments are excluded in the wage calculation for that time period. CP at 10-11. It also ruled that employer payments into union trust funds for retirement plans, health benefits to be provided during retirement, short and long term disability protection, life insurance, and death and dismemberment protection were not "wages" because those were not critical to protecting a worker's basic health and survival at the time of injury. CP at 11. Dumont moved for direct appeal and this case was consolidated with Gallo, Renshaw, Barber, and Jones.

ANALYSIS
¶ 20 Under Washington's Industrial Insurance Act, Title 51 RCW (Act), time-loss and loss of earning power compensation rates are determined by reference to a worker's wage at the time of injury. RCW 51.08.178; Cockle, 142 Wash.2d at 807, 16 P.3d 583; see also RCW 51.32.090(1), (3); .060(1). "The purpose of time-loss compensation is to reflect a worker's lost earning capacity." Double D Hop Ranch v. Sanchez, 133 Wash.2d 793, 798, 947 P.2d 727, 952 P.2d 590 (1997). Thus, "wages" are the basis from which time-loss compensation is computed. Cockle, 142 Wash.2d at 806, 16 P.3d 583. The term "wages" is defined in RCW 51.08.178(1), which states in relevant part:
(1) For the purposes of this title, the monthly wages the worker was receiving from all employment at the time of injury shall be the basis upon which compensation is computed unless otherwise provided specifically in the statute concerned. In cases where the worker's wages are not fixed by the month, they shall be determined by multiplying the daily wage the worker was receiving at the time of the injury:
. . . .
The term "wages" shall include the reasonable value of board, housing, fuel, or other consideration of like nature received from the employer as part of the contract of hire, but shall not include overtime pay except in cases under subsection (2) of this section. However, tips shall also be considered wages only to the extent such tips are reported to the employer for federal income tax purposes. The daily wage shall be the hourly wage multiplied by the number of hours the worker is normally employed. The number of hours the worker is normally employed shall be determined by the department in a fair and *570 reasonable manner, which may include averaging the number of hours worked per day.
¶ 21 In Cockle, this court addressed the question of whether the value of employer-provided health care coverage is included in the basis used to calculate workers' compensation payments under RCW 51.08.178. We concluded such benefits do constitute "`other consideration of like nature'" and must be included as wages. Cockle, 142 Wash.2d at 822, 16 P.3d 583.
¶ 22 In reaching our holding, we noted that the legislature intended to define the term wages to include "the value of at least some in-kind work `benefits.'" Id. at 808, 16 P.3d 583. Specifically, the language "`other consideration of like nature'" expanded the definition of wages beyond its "arguably more common usage." Id. (quoting RCW 51.08.178(1)). However, we rejected a claim by Cockle that "all consideration" paid by the employer should be included in the wage calculation, a position adopted by Justice Marshall's dissent in Morrison-Knudsen Construction Co. v. Director, Office of Workers' Compensation Programs, 461 U.S. 624, 638, 103 S.Ct. 2045, 76 L.Ed.2d 194 (1983) and urged by Cockle. Instead, relying on the ejusdem generis rule of construction, we adopted a narrower view, ruling that the phrase "`board, housing, fuel, or other consideration of like nature'" means "readily identifiable and reasonably calculable in-kind components of a worker's lost earning capacity at the time of injury that are critical to protecting workers' basic health and survival." Cockle, 142 Wash.2d at 822, 16 P.3d 583 (quoting RCW 51.08.178(1)). Applying this definition we determined that while the payments for Cockle's health care were not part of her cash wages, they were a noncash wage under the "other consideration" language of RCW 51.08.178. Id.
¶ 23 The Board orders, as well as the superior court and Court of Appeals' rulings in these cases, applied what the parties refer to as the "Cockle" test, and concluded that the employer contributions to certain benefit trust funds established in the CBA's in these cases do not meet the definition of wages for purposes of RCW 51.08.178(1). Gallo and the appellants claim, however, that Cockle is inapposite. Instead, they contend that all sums paid pursuant to their CBAs are cash wages and thus, are not subject to the Cockle test. Alternatively, the workers argue that the employer contributions to various benefit trust funds constitute "other consideration" and, accordingly, meet the test enunciated in Cockle.
¶ 24 Turning to the first contention, the workers offer a number of arguments in support of their claim that all benefits paid by their employers under the CBAs constitute cash wages. First, the workers claim that the CBAs governing their employment relationships provide for payment of an hourly wage. For example, Gallo refers to her CBA, which states that it "shall constitute an Agreement between the parties hereto for the work, conditions and wage rates provided for herein." Pet. for Review at 13. Under the agreement in her case, the employer was required to pay $18.10 per hour directly to Gallo with $2.55 to be sent to the Operating Engineers Local 370-AGC Trust Fund, $2.50 to be sent to the local's retirement trust, and $.30 to be sent to the local's training trust fund based on hours worked. Thus, for every hour worked, Gallo's employer was required to pay $23.34. According to Gallo, the parties intended that all sums paid pursuant to the CBA were to be her "hourly wages."
¶ 25 The workers argue that the term "hourly wage" is unambiguous. They claim that the ordinary meaning of "hourly wage" as it is used in RCW 51.08.178(1) is the money an employer pays a worker per hour for work performed. Thus, they contend, the hourly wage negotiated between the unions and the employers constitutes their wages and the manner in which workers decided to spend or invest their "wages," i.e., deposit sums into trust funds, does not change their "wages" into "no[n]-wages." They assert that the court's reasoning in Cockle does not apply in these cases because Cockle held only that the term "other consideration" is ambiguous. Renshaw, Barber, Dumont, & Jones Suppl. Br. at 34.
¶ 26 The workers misread Cockle. Although the court's discussion of wages focused on the "other consideration" language *571 in RCW 51.08.178(1), it did so in construing the term "wages," which is defined as including "the reasonable value of board, housing, fuel, or other consideration of like nature received from the employer as part of the contract of hire." RCW 51.08.178(1). As we noted in Cockle, the legislature expanded the "ordinary" definition of "wages" when it included "the reasonable value" of certain benefits. Cockle, 142 Wash.2d at 808, 16 P.3d 583. We reasoned that including the value of certain benefits in the definition of wages indicates that the legislature did not intend that all consideration given in exchange for work is to be included in "wages." Id. Thus, we concluded that the additional language rendered the term "wages" ambiguous. Id. Merely coupling the word "hourly" with the term "wages" does not answer the question of whether the employer contribution to benefit funds are cash wages, "other consideration of like nature," or nonwage fringe benefits.
¶ 27 Next, the workers argue that because the employers in these cases pay money to union trust funds for the purpose of providing benefits, and do not themselves provide benefits directly to the employees, the employer payments are "cash" wages. In Cockle, the employer agreed to pay Ms. Cockle an hourly wage and to provide medical and dental coverage for which the employer agreed to pay monthly premiums. The workers argue that Cockle's test is inapplicable in these cases because their CBAs only require employers to pay "hourly wages," not to provide benefits.
¶ 28 While the workers correctly note distinctions between Cockle's employment contract and the CBAs here, there are also significant similarities. For instance, like Cockle, the workers in this case never received, in hand, the benefit payments. Additionally, in Cockle, the employer purchased health care coverage under the terms of the employment contract. Cockle, 142 Wash.2d at 805, 16 P.3d 583. Similarly, the terms of the CBAs here specify that for every hour worked, the employer is required to directly pay into union trust funds a sum-certain for various specified benefits. Thus, as in Cockle, the employers here are contractually bound to make payments for the purpose of providing benefits to the workers. In Cockle, the written employment contract required payment of a base wage, plus provision for health care coverage. Id. at 805, 16 P.3d 583. Similarly, here the CBAs require the employer to pay a base wage which the employee takes home in the form of a paycheck, reflecting this base wage, less taxes, as well as payments into specified trust funds, which in turn provide various benefits such as health care coverage, pension, and training.
¶ 29 The workers argue, though, that through the CBAs they negotiated a bottom line, the "hourly wage," and the union membership unilaterally determines how those "wages" are spent, i.e., retirement or health care benefits. Whether or not it is true that the union membership unilaterally decides into which trust funds the employer payments are deposited, once those decisions are made and written into the CBAs, the terms of these agreements represent the rights and obligations of the parties, which cannot be unilaterally altered, at will, by the worker. Moreover, the CBAs distinguish between wages and contributions for benefits. See, e.g., CABR (Dumont) at 85-86 (benefits), 99 (wages); CABR (Jones) ex. 4, at 86-89 (wage and fringe benefits); CABR (Renshaw) ex. 1, at 25-27, ex. 2 (wage rate and fringe benefits). The distinction between wages and benefits is significant because it makes clear that the parties did not intend that all sums paid be considered wages and that those sums intended to fund benefits would not be paid directly to the employees as wages.
¶ 30 And, as the Department notes, the funds paid by the employers into the CBA trust funds can never become the property of the workers. Rather, CBAs are governed by the Taft-Hartley Act (Labor Management Relations Act, 1947, 29 U.S.C. §§ 141-187), which requires that employee benefits such as health care and retirement must be provided through trust funds that are governed by joint labor-management boards, and that the trustees on the joint labor-management board have absolute, exclusive fiduciary responsibility. 29 U.S.C. § 186(c)(5)(B); Employee Retirement Income Security Act of 1974 (ERISA), 29 *572 U.S.C. § 1103. Additionally, the Internal Revenue Code grants income tax exemptions for trust plans if the trust plans provide employee benefits through "qualified trust funds" and "tax exempt trust funds." 26 U.S.C. § 501. Thus, the sums paid by employers into the trust funds delineated in these CBAs cannot be "cash wages" since the employees individually have no control over these sums. As both the Department and the workers note, there are significant tax advantages to both the workers and the employers that can be gained only by not treating these benefits as cash wages. Under 26 U.S.C. § 404, employers can deduct contributions to these plans, while under 26 U.S.C. § 402, the workers cannot be charged with the contributions as income when the contributions are made.
¶ 31 Gallo argues, though, that the employer payments under the CBAs are analogous to "cafeteria" plans or payroll deduction plans in which employers pay particular obligations of a worker (e.g., child care, health care) out of the worker's wage pursuant to the plan. Similar to the "cafeteria" plan, Gallo claims, her wage is the amount of money due before sums are sent to designated recipients (in this case the union trust funds), not after. Gallo claims that regardless of the allocation of her wages, she is the direct recipient of the hourly wage paid by the employer for her labor. Thus, her wages consist of all payments made under the CBA.
¶ 32 Gallo's analogy to "cafeteria" plans is unpersuasive. Cafeteria or payroll deduction plans are governed by the complex statutory schemes under ERISA, the Internal Revenue Code, and labor law. See ERISA, 29 U.S.C. §§ 1001-1461; see, e.g., 29 U.S.C. § 186 (Taft-Hartley laws governing financial transactions as part of labor-management agreements). In addition, the theory that payments to trust funds are actually cash wages is inconsistent with the rationale underlying the federal statutes governing CBA trust funds. As noted, it is a significant tax advantage to both the employers and the workers that employee-benefit plans be "qualified" under federal income tax law. These benefits are realized only because the payments to trust funds are not deemed to be direct cash transfers from the employers to the employees. Id. A CBA either complies with the requirements of such plans or it does not.
¶ 33 Essentially, Gallo and the appellants contend that the amounts paid by employers into the various union trust funds are in the nature of voluntary deductions taken from employee wages for the purposes described in the CBAs. But, where the parties to a CBA intend to treat contributions as voluntary deductions from wages, the parties can do so explicitly. For example, at least one of the CBAs in these consolidated cases explicitly provides that payments to certain funds are included in wages.[8]
¶ 34 Next, the workers claim that the Department is relying on labels in the CBAs to determine the nature of the compensation and that Cockle rejected the use of labels when it determined that health care premiums are wages. See Cockle, 142 Wash.2d at 822-23, 16 P.3d 583. While it is true that using the label "fringe benefit" does not determine whether the value of the benefit is part of wages under RCW 51.08.178(1), reference to the CBA is necessary. In fact, the workers themselves rely on the terms of their CBAs to make their "bottom-line," "hourly wage" argument. While Cockle did not consider labels determinative of whether the amount that Cockle's employer spent to purchase health insurance was a part of wages, even Cockle looked to the employment contract to determine the nature and form of the payments. Cockle concluded that the value of some, but not all, benefits must be included in wages, recognizing a distinction between "fringe benefits" and "wages."
*573 ¶ 35 Looking beyond labels, the workers have not shown how all payments made by their employers into trust funds pursuant to the negotiated terms of the CBAs are a cash "wage" to the employees within the meaning of RCW 51.08.178(1). Although the workers claim that all compensation paid pursuant to the CBAs constitute a cash wage that the workers then direct to various trust funds, the negotiated terms of the CBAs do not state that the employer is to pay an aggregate amount to the employee who will then determine the amount to be deposited into trust funds. Instead, the terms of the CBAs state that the employers will make payments into trust funds for the benefit of the employees and lists the trust fund payments as fringe benefits paid in addition to listed wage rates. E.g., Inland Northwest Ass'n Gen. Contractors of America and International Union of Op. Eng. Local 370; CABR (Gallo) ex. 1, at 22-29.
¶ 36 Gallo and the appellants contend though, that their position must prevail because the Act is intended to minimize work-related suffering and economic loss and emphasizes that an injured worker should be compensated based not on a arbitrarily set figure, but on his or her actual "`lost earning capacity.'" Cockle, 142 Wash.2d at 811, 16 P.3d 583. However, as this court recognized in Cockle, the legislature did not intend that all forms of consideration, in cash or in kind, be included for purposes of time-loss compensation calculations. See Cockle, 142 Wash.2d at 821, 16 P.3d 583. Rather, the legislature intended to include in wages only those items of in-kind consideration that a worker must replace while disabled and that are critical to the worker's health or survival. See id
¶ 37 The workers also rely on Cockle's approval of Justice Marshall's dissent in Morrison-Knudsen Construction Co. v. Director, Office of Workers' Compensation Programs, 461 U.S. 624, 638, 103 S.Ct. 2045, 76 L.Ed.2d 194 (1983), as support for their claim that all sums, including sums paid by employers to fund benefits are included in wages. Although the court did agree with the concerns expressed in the Marshall dissent, the court rejected its broad, "all consideration" approach. Instead, the majority in Cockle recognized that the legislature limited the definition of wages to paycheck wages and the value of "other consideration" such as board, housing, and fuel. Moreover, even the dissent in Morrison-Knudsen recognized that contributions to CBA health and welfare trust funds are "noncash ... fringe benefits." Morrison-Knudsen Constr. Co., 461 U.S. at 642, 103 S.Ct. 2045 (Marshall, J., dissenting).
¶ 38 The workers also claim their view must be adopted in order to avoid strained or absurd results. They point to prevailing wage statutes to argue that unjust and inconsistent results will occur if the employers' trust fund payments are not treated as wages. According to the prevailing wage statute, RCW 39.12.010, the "`prevailing rate of wage', for the intents and purposes of this chapter, shall be the rate of hourly wage, usual benefits, and overtime paid in the locality." The prevailing wage must be paid on specified public works projects, regardless of whether the worker is a union worker or a nonunion worker.
¶ 39 To illustrate their point, they compare Jones, who worked on a prevailing wage job, with a nonunion worker doing the same job as Jones. Both earn $33.52 per hourthe nonunion worker receives this amount in his paycheck but Jones's wages are divided between his paycheck and contributions to trust. If the nonunion worker is injured, his "hourly wage" for purposes of RCW 51.08.178 is $33.52, but Jones's "hourly wage" is reduced by the amount paid into various trust funds. Additionally, they claim that the same result would occur on nonprevailing wage jobs where both union and nonunion workers are paid under CBA mandated rates. In Gallo's case, other than citing RCW 39.12.010 and .020 generally and RCW 39.12.021 as it pertains to apprentices, Gallo does not explain how the prevailing wage statutes apply.
¶ 40 The Department claims that the "prevailing wage" statutes are irrelevant to the issues presented here. It argues that any wage disparity under RCW 51.08.178 reflects the legislative policy choice that distinguishes between cash wages and fringe benefits in that statute.
*574 ¶ 41 Initially, we are not convinced that interpreting the definition of "prevailing rate of wage" in RCW 39.12.010 and the term "wages" in RCW 51.08.178(1) differently results in an injustice to the union worker. Although the nonunion worker might be advantaged in receiving a larger "wage" if he is injured, the union worker may be provided many benefits that the nonunion worker does not receive. Additionally, the nonunion worker is taxed on the entire $33.52 in the workers' example, whereas Jones is not taxed on his employer's contributions to benefits.
¶ 42 More importantly though, RCW 39.12.010(3) provides that "[t]he `usual benefits' for the purposes of this chapter shall include the amount of: (a) [t]he rate of contribution irrevocably made by a contractor or subcontractor to a trustee or to a third person pursuant to a fund, plan, or program." Clearly, the legislature recognized that there is a distinction between the "rate of hourly wage" and "benefits." RCW 39.12.010(1), (3). Further, overtime is included in the definition of "prevailing wage rate" while RCW 51.08.178 excludes it. And, the prevailing wage statutes serve a different legislative purpose than the compensation calculation statute, RCW 51.08.178(1). Finally, it is RCW 51.08.178(1) and the court's construction of the statutory term "wages" in Cockle that control the calculation of an injured worker's hourly rate for the purpose of computing time-loss compensation, not the prevailing wage statutes.
¶ 43 Based on RCW 51.08.178(1) and our recent decision in Cockle, we hold that employer contributions to the union trust funds involved in these cases are not "cash wages." Further, we hold that the value of such contributions is included in "wage" computation only if the sums are "readily identifiable and reasonably calculable in-kind components of a worker's lost earning capacity at the time of injury that are critical to protecting workers' basic health and survival." Cockle, 142 Wash.2d at 822, 16 P.3d 583. Accordingly, we will apply our test from Cockle to the benefits at issue in these cases.
¶ 44 Turning to the workers' alternative argument, the workers contend that the employer contributions to the retirement trust fund should be included as part of wages under the Cockle test because retirement benefits are critical to their health and survival. The Department claims that the payments to retirement trust funds do not meet the "receiving ... at the time of injury" limitation under RCW 51.08.178(1) and are not critical to the basic health and survival of the injured worker.
¶ 45 As the workers correctly note, the question is whether the employer was providing consideration of like nature at the time of the injury. Clearly, the workers were "receiving" the retirement benefit at the time of the injury because the employer was making payments into the retirement trust. However, the test we adopted in Cockle was premised, in part, on the notion that a benefit is "other consideration" if a worker cannot survive without it, even during a period of temporary disability. Appellants and Gallo argue that retirement benefits meet the Cockle test because money invested for retirement during the working years makes retirement possible and that in our society, people need money to live. Although the payments to the retirement trust funds are "readily identifiable and reasonably calculable" because the CBAs specify the amount paid into each trust fund, they are unlike health care benefits. They are not critical to the "basic health and survival" of the injured worker at the time of injury because they are not intended to be, nor are they generally immediately available to the worker at the time of injury. Accordingly, retirement benefits are not the sort of benefits that a worker must replace during the period of disability to preserve health or in order to survive during the period of disability and do not constitute wages for purposes of RCW 51.08.178.
¶ 46 Regarding the apprenticeship training trust payments and the LECET payments, appellants claim these benefits should be included because they "enable[] workers to remain competitive for jobs," and "support[] market share for high-wage jobs." Renshaw, Barber, Dumont, & Jones Suppl. *575 Br. at 38.[9] However, appellants do not provide further explanation as to how these benefits satisfy the Cockle test.
¶ 47 The payments for LECET go to a labor management industry promotion fund. The payments for apprenticeship training trust funds are intended to help workers improve their technical skills. Thus, neither is critical to an injured worker at the time of injury. Receipt of training payments or LECET payments are not going to help rehabilitate an injured worker in the same way as health care coverage because they are not critical to basic needs when the worker is injured. These benefits, too, were properly excluded from wage calculations.
¶ 48 Regarding the payments for life insurance, the workers summarily assert that payments for life insurance should be included in wages because they "replace[] wages for dependents." Renshaw, Barber, Dumont, & Jones Suppl. Br. at 38. While it is clear life insurance provides for dependents, the workers do not explain how this is critical to the "basic health and survival" of the injured worker at the time of injury. Nor do they explain how life insurance "replaces wages for dependents" when a worker is injured. If the worker is killed, then there is a payment to his or her beneficiary. However, it does not follow that the payment would be "wages" for the dependents. Thus, life insurance was properly excluded from wages under RCW 51.08.178.
¶ 49 Regarding the payments for disability insurance, the workers again summarily assert that "disability insurance replaces wages." Renshaw, Barber, Dumont, & Jones Suppl. Br. at 38. They do not explain what is included in "disability insurance," under what conditions the insurance is available to the worker, or why disability insurance is critical to the health or survival of the worker such that the worker would be required to replace this benefit during the period of disability. Without more we are compelled to conclude that these payments were properly excluded from wages.
¶ 50 In sum, we find the payments to the retirement trust funds, the apprenticeship training trust funds, LECET, life insurance, and disability insurance in these cases should not be included in the appellants' time-loss compensation because these benefits are not consideration of like nature to board, housing, fuel and health benefits and are not critical to the basic health and survival of the injured worker at the time of injury.
¶ 51 In determining whether the benefit payments at issue here meet the Cockle test for inclusion in wages, the Department argues this court should defer to and give effect to a number of rules it promulgated in response to Cockle. These WACs define the term "wages" in RCW 51.08.178(1), as well as provide that employer contributions to benefit trust funds are subject to the Cockle test.[10] Although these rules did not become effective until June 15, 2003, well after these consolidated cases began, the Department claims that interpretive rules are retroactive if so intended. Based on our resolution of the issues in this case, however, we have no need to consider either the applicability or effect of these rules.
¶ 52 Next, appellants Dumont and Jones claim it was error to exclude the value of Dumont's and Jones's health and welfare benefits in the calculation of their "wages" under RCW 51.08.178(1). The Board did so because it found Dumont and Jones retained those benefits either through their employers or through the trust funds during their periods of disability. The Department claims Dumont and Jones are seeking to obtain a double recovery.
*576 ¶ 53 In Cockle, this court agreed with the Court of Appeals
"that time-loss compensation is meant to `reflect ... lost earning capacity,' not retained earning capacity. When an injured worker retains his or her health insurance, he or she retains that part of his or her earning capacity, and his or her time-loss compensation should be computed accordingly."
Cockle, 142 Wash.2d at 814-15, 16 P.3d 583 (quoting Cockle, 96 Wash.App. at 81, 977 P.2d 668) (footnote omitted).
¶ 54 Like the Court of Appeals,
[w]e ... read RCW 51.32.090(6) to mean that, to the extent employer-provided "wages"whether in the form of money, board, housing, fuel, or health care coverageare continued during temporary total disability, time-loss compensation is reduced accordingly. Title 51 RCW was intended to "reduce[e] to a minimum" an injured worker's "economic loss." RCW 51.12.010. Logically, any portion of "wages" that injured workers continue to enjoy during their disability period is not part of their "economic loss."
Cockle, 142 Wash.2d at 815 n. 6, 16 P.3d 583.
¶ 55 Here, the record shows that Dumont and Jones retained their health care benefits during at least part of their disability period. Thus, these benefits are not included in the calculation of wages under RCW 51.08.178(1).[11]
¶ 56 Jones and Dumont argue though, that there is no evidence that their employers continued to pay them wages during the disability period. This contention, apparently, is based on the worker's view that the medical insurance coverage came from an independent source, the trusts. However, Jones's and Dumont's employers pre-funded the continuation of these benefits during the disability period and thus, under Cockle the Department properly excluded the value of medical insurance from its wage calculation.
¶ 57 Finally, appellants Renshaw, Barber, Dumont, and Jones claim the Department's conduct in regard to "wages" violates its fiduciary duty implicit in RCW 51.12.010. Although they state that this claim is not necessary to decide the merits of this appeal, they ask that we address this issue because it is of fundamental importance to justice under the Act for thousands of injured workers. The gist of their argument is that because the Department has not interpreted "wages" under the Act more broadly, the Department has violated its fiduciary duty. However, because the issues in these cases may be resolved without reference to the workers' claim of a breach of fiduciary duty, we decline to address the argument.[12]
¶ 58 We affirm the Court of Appeals and superior courts.
ALEXANDER, C.J., C. JOHNSON, SANDERS, BRIDGE, CHAMBERS, OWENS, and FAIRHURST, JJ., and IRELAND, J. Pro Tem., concur.
NOTES
[1] Gallo was consolidated with Renshaw v. Department of Labor & Industries, No. 75064-5; Dumont v. Supervalu, Inc. & Department of Labor & Industries, No. 75070-0; Barber v. Department of Labor & Industries, No. 75071-8; and Jones v. Department of Labor & Industries, No. 75088-2.
[2] The record's only explanation for contributions to the LECET is that it is a labor-management industry promotion fund; a marketing program. Certified Appeal Board Record (CABR Barber) (Bindner testimony) at 12.
[3] A "hod" is a trough carried over the shoulder for transporting loads, such as bricks.
[4] The Department filed a cross appeal challenging the superior court's decision that contributions for life and disability insurance must be included in determining monthly wages. The Department has abandoned its cross appeal, however, because, it asserts, the Department mistakenly included these contributions in its wage calculation and, therefore, the issue of whether those contributions were properly included is moot.
[5] This was comprised of the base wage of $23.78, plus $1.25 for vacation and $1.00 for union dues. Certified Appeal Board Record (CABR Jones) at 7-8, 127; ex. 6, at 212. The Department now concedes that the union dues were properly wages because Jones directed the payment of dues from his own taxable wages.
[6] The State has not cross appealed the Board's ruling relating to vacation benefits.
[7] This figure is comprised of $315.55 for health insurance, $12.00 for accidental death and dismemberment insurance, $8.00 for short-term disability insurance, $6.00 for long-term disability insurance, and $1.00 for life insurance for his dependents in the event of his death. Certified Appeal Board Record (CABR Dumont) at 139.
[8] In the "Laborers' Master Agreement," the CBA governing in Renshaw's and Barber's cases, Appendix 1, relating to wages and fringe benefits, provides that payments to health, security, pension, apprenticeship and training, and LECET are fringe benefits but that payments to the credit union, Northwest Fair Contracting, and union dues are wage deductions and that "these deductions are included in wages." CABR (Barber) at 25. Additionally, the CBA provides that the union, at its option, may elect to take up to 20 cents from wages to apply to fringe benefits with 60 days' notice prior to any anniversary date of the agreement. Thus, even where contributions to various trust funds can be deducted from wages, such a decision can be made only by the union, not by the individual worker. CABR (Dumont) at 25-26.
[9] The Court of Appeals noted that Ms. Gallo conceded at oral argument that the payments to the apprenticeship training program did not satisfy the Cockle analysis. Gallo v. Dep't of Labor & Indus., 119 Wash.App. 49, 59, 81 P.3d 869 (2003).
[10] WAC 296-14-522 defines wages as (1) "cash wages," (2) bonuses, and (3) the "reasonable value of board, housing, fuel and other consideration of like nature." WAC 296-14-524(1)(a) and (c) define "other consideration of like nature" to be benefits "objectively critical to protecting the worker's basic health and survival at the time of injury," in other words, benefits that provide "a necessity of life" and that are "critical to protecting the employee's immediate health and survival."
[11] In this court Dumont and Jones argue that no adjustment in compensation can be made where health care benefits continue during a period of "temporary partial disability" in contrast to temporary total disability, relying on language in RCW 51.32.090(6). Dumont and Jones failed to raise this argument in their petitions for review to the Board as required by RCW 51.52.104. Accordingly, we decline to address their contention. In any event, we think Cockle resolves this issue.
[12] Both Amici claim that this court should overturn Cockle. None of the parties have advocated that this court overturn Cockle. It is a well-established rule that new issues may not be raised for the first time on appeal by amici curiae. Harmon v. Dep't of Soc. & Health Serv., 134 Wash.2d 523, 544, 951 P.2d 770 (1998). Thus, we decline to address this argument.