# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| ANNE L. BAILEY, | ) | NO. 73365-6-I |
| | ) | |
| Appellant, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| KENT SCHOOL DISTRICT, | ) | UNPUBLISHED OPINION |
| | ) | |
| Respondent. | ) | FILED: May 16, 2016 |
| | ) | |

2016 MAY 16 AM 11:16
FILED
COURT OF APPEALS DIV 1
STATE OF WASHINGTON

LAU, J. — Anne Bailey appeals the summary judgment dismissal of her hostile work environment, retaliation, and Family Medical Leave Act (FMLA) claims against her former employer, the Kent School District. The trial court properly dismissed her claims because she failed to show an essential element on her hostile work environment and retaliation claims. And even if we assume an FMLA violation, Bailey shows no adverse consequence from the District's policy. We affirm.

## FACTS

Anne Bailey was hired in 2005 by the Kent School District to teach special education at Kent-Meridian High School. About two years later, she also took on curricular leader duties. This required Bailey to make new student placement decisions.

Bailey's coworker, Tabitha Browning, disagreed with Bailey's new student assignment protocol. Browning wanted to teach only students who were on her "case load." This dispute caused Bailey and Browning to bitterly clash over the years. Building Principal Wade Barringer explained Browning's adamant stance for teaching only case load students:

> [Browning] was very adamant about having only kids on her caseload in her classes. . . . That way, she has control of her kids' learning. If they're—if she has kids that are being served in math, then instead of having another math teacher, she has control over their IEP. She knows their goals. She knows exactly what they need to be learning versus having to—the other non-case manager special ed teacher ha[s] all the accommodations and information about those students' goals, it would cut out the middleman and she would have that direct knowledge of what those students needed, so therefore, having all of her kids in her caseload, she'd be able to teach exactly what the IEP team and she had decided were the goals for that student.

Clerk's Papers (CP) at 52.

But this was not the only source of their conflict. In February 2011, Bailey wrote to Barringer to express frustration over the behavior of "an individual" who was "allowed to ignore" school policies. CP at 263. She claimed "this individual has again circumvented department protocol, undermined the leadership, and gone to an administrator disrupting our procedures in place." CP at 263.

Bailey's letter pointed to Browning's failure to follow department protocol. She said Browning pressured a coworker to take a learning disabled student that had been assigned to Browning's class. She complained that Browning performed an "under the table switch to get a student out of her class." CP at 264. And she described how Browning forced a learning disabled student out of her classroom, "[t]he same individual insisted the student was EED and force moved this student out of her classroom and off

her caseload." CP at 264. Bailey questioned why Browning was allowed to break the rules:

> What I don't understand is how an individual can circumvent department procedures and protocol, undermine department leadership and placements, and be given permission by admin to assess and move students. . . We all take the students and teach them. Why then, is this one individual allowed the luxury to give additional assessments, and move students out of her class to maintain class size and autonomy. The rest of our department does not have the luxury, and follows agreed upon department procedures. General ed and ELL teachers do not have this privilege either to my knowledge.
>
> . . . .
>
> I am simply identifying how our team cannot work as a well-oiled machine when individual team members run rogue.

CP at 264-65.

Bailey's letter suggested that the District create a full time administrative "Special Services Coordinator position" to do administrative and curricular leader duties. CP at 262. Bailey asked for help to manage her workload and more support for her personal and professional growth.

In June 2012, Bailey wrote a 12-page letter to Barringer. The letter alleged that Browning's actions created, "a hostile work environment [that] has been ongoing for the seven years in which I have been an employee at Kent-Meridian High School and Kent School District." CP at 267. She said Browning "publicly humiliated," "belittled," "maligned" "intimidat[ed]," "chew[ed] out," and otherwise came into conflict with her and school employees. CP at 267-71. In addition, Bailey also claimed Browning discriminated against students of color:

> [Browning] continually circumvents department building protocol regarding IEP team decisions, SE student placements, SE student scheduling and registration, and presses staff to make changes or change decisions, in particular with students of color that have a specific skill set, behaviors, or are challenging.

-3-

CP at 272 (emphasis added). She discussed how Browning's behavior negatively affected students. Bailey also claimed "there were feelings that [an African American teacher] was being singled out and discriminated against." CP at 268.

She blamed Browning's behavior for the negative impact on her health: "migraines, high blood pressure, nausea and undo [sic] stress," which has "impacted my ability to function efficiently, increase/impacted my workload and that of others within the department, and caused me to use a sick day on June 7, 2012 due to her behaviors." CP at 276.

Bailey's deposition testimony described how Browning treated students of color differently. She described several examples that her husband, Ed Bailey, an instructional aide, told her about.

> For example, a student of color that has transferred to our school, the student required, for her specifically designed instruction, a class that [Browning] taught. The student was placed in her class for that part of the student's IEP.
>
> [Browning] told Ed Bailey in front of the student, within hearing of other students that, [s]he's behavior, I don't want her here, she does not belong in my class.

CP at 226-27.

> There were other students in the class that would be off task, goofing off, talking, making noise. This particular African American male student, if he shuffled his feet, he turned around or spoke, she'd say, [s]top, be quiet, don't do that, turn around. She criticized how he solved math problems. She would not allow him to eat his breakfast or some food in class after missing breakfast, but allowed other students in the class to eat food in the class.

CP at 227.

> The sibling of this student, also African American female, transferred in. Ms. Browning did not allow her to enter the classroom. She put up her hand, per Mr. Bailey, shooed her out into the hall, told Mr. Bailey to take her to the library and give her an assessment test to see if she was placed correctly. Mr. Bailey said—told Ms. Browning, We're no longer giving that test; she doesn't feel well today. Ms. Browning said, Give it to her anyway.

CP at 227-28.

Bailey acknowledged that several parents commented on Browning's behavior, but none mentioned race as a factor, "[t]hey complained about different treatment. They did not say of color." CP at 32.

Barringer first learned about Bailey's discrimination accusations against Browning in Bailey's June 2012 letter. The labor relations director contacted the teacher's union to arrange for mediation between Bailey and Browning.

On June 19, the teacher's union asked Bailey to withdraw her complaint. She declined and Bailey claims the union president threatened her with disciplinary action.

On August 3, Bailey and Browning unsuccessfully mediated their disputes. Bailey acknowledged that Browning wanted to "work this out" and appeared "sincere." CP at 36. But she claimed the mediator cut her off, told her she was lying, and displayed aggressive and angry behavior. Bailey left the mediation upset and withdrew her grievance.

Ed Bailey said the mediation "traumatized" Bailey and caused her to take a leave of absence. CP at 47. Bailey asked about taking medical leave. The District told her she could not apply for FMLA leave until she exhausted all her paid leave.

On August 16, Bailey prepared for the upcoming school year. Bailey sent Barringer a letter from her doctor three days before school started. Dr. Gallevo

disclosed that he was treating Bailey for an "acute medical condition" and "recommend[ed] medical leave for 6 weeks." CP at 483.

Bailey met with Barringer before her medical leave to talk about her excessive workload. Bailey repeated her earlier request for a non-teaching position with emphasis on curricular leader duties. Barringer declined and explained that the District lacked sufficient staff "to make her a full-time non-teaching position." CP at 318. He said he would check into it. Barringer discussed Bailey's request with the executive director of inclusive education, Kim Haley. He told her about Bailey's health concerns, reluctance to return as a full time teacher, and the problems with Browning. Haley told Barringer the District lacked staffing availability for a purely administrative position.

Barringer redistributed Bailey's students and case load responsibilities to other teachers due to Bailey's medical leave. The co-curricular leader, Shaundra Rogers, agreed to take on full responsibility for this job until Bailey returned.

In November 2012, Barringer and Bailey talked briefly about her return to work. Bailey asserts Barringer said the District declined to approve the full time administrative position she proposed, and it named another teacher the "department head." He "wanted to be sure" that what she was "expecting to come back to was actually what it was" and she "had to teach full-time, five periods, with full IEP caseload, or resign." Bailey alleged Barringer told her she had "emotional problems." CP at 252.

Bailey decided not to return to work after she met with her treatment provider. On November 2, 2012, Bailey submitted an FMLA application for medical leave to begin that day and with an expected return date of February 4, 2013. She described her

serious health condition as "309.28 Adjustment disorder with mixed anxiety [and] depression" caused by "bullying environment at work." CP at 282.

About a week later, Bailey filed a discrimination claim with the Equal Employment Opportunity Commission (EEOC). She alleged that Barringer's negative attitude and her "demotion" were motivated by her disabling condition and request for accommodations. She also alleged that the District gave her oral approval "for a non-teaching position for 2012-13 school year. I was informed during the 11/1/12 phone call to return to work as a teacher or resign." CP at 501.

On November 27, Bailey's attorney wrote a letter to request the District to accommodate Bailey's medical condition by creating a non-teaching job for her based mainly on Bailey's present duties as a curricular leader.[1] The letter claimed that the District had failed to engage in "any type of interactive process with Ms. Bailey to collaboratively design appropriate reasonable accommodations." CP at 211. Bailey proposed a non-teaching accommodation:

> The accommodations she is seeking include the following:
> a. To continue functioning in the shared Department Head role;
> b. To perform non-teacher administrative duties in the Special Education Department at Kent-Meridian high School until the end of the school year; and,
> c. To provide support services for Special Education students at Kent-Meridian High School—to include collaborating with special education teachers to further the goals of the students.

CP at 211. If granted, Bailey proposed "to return to work in January 2013 immediately after Winter Break. . ." CP at 211. The District asked for a meeting to discuss Bailey's proposed accommodations.

---

[1] Bailey's official title was co-curricular leader. She describes her position variously as curricular leader and department head.

On December 10, Bailey, her attorney, District officials, and the District's attorney, Chuck Lind, met to discuss Bailey's request for accommodations. Bailey asked for the non-teaching accommodation described in her letter to the District. Lind repeated the District's position on Bailey's request for a non-teaching job. He told her the District could not create an all administrative non-teaching job for her. Lind informed her she would have to return to teaching three classes per day and resume work as co-curricular leader. At this meeting, Bailey agreed to return to work without accommodations.

On December 13, Bailey's attorney followed up with a letter to Lind about the December 10 meeting.

> [W]e agreed that Ms. Bailey will return to work in January 2013. She will resume her co-Department Head duties . . . [a]s of our meeting, no final decision had been made by the district about her date of return . . . It makes sense for Ms. Bailey to return early in January so that she may get up to speed. . .

CP at 511. The letter included items Bailey proposed to work on before the next semester, "[w]ith all this to accomplish before the semester begins, we propose that Ms. Bailey return immediately after the winter break." CP at 512.

On December 14, Lind confirmed Bailey's return to work date, "at the end of January 2013, and sooner, if possible." CP at 516. He warned, it was "highly unlikely that the school will be able to transition you back to classroom assignments and other responsibilities in the few weeks remaining in the semester." CP at 516.

In Lind's December 17 letter to Bailey's attorney, he told her that Bailey could return to work on January 28, 2013, when the new semester started. Lind disagreed with Bailey's attorney on the return to work date issue: "[t]here was an agreement at this

meeting that she would return to work during the second semester, and earlier only if the district had a specific need. Currently there is no such need, according to the building principal." CP at 519.

The District was closed for winter break between December 20, 2012 and January 3, 2013.

On December 21, Bailey sent the District a letter from her doctor stating "[s]he is medically cleared to return to work on 1/3/13." CP at 523. Bailey's attorney e-mailed Lind the same day about the return date:

> Ms. Bailey asks that the District treat her similarly and reconsider and allow her to return on 1/3. Moreover, her return date should be governed by her doctor's release, not some arbitrary date set by the employer. It will be a disservice to the students to force Ms. Bailey to begin her new year with no planning. Please let me know at your earliest convenience if the District will allow Ms. Bailey to return to work as a paid employee on 1/3 if her doctor so recommends.

CP at 528.

Lind explained that when Bailey took medical leave on short notice, Barringer redistributed her responsibilities among the staff:

> When [Bailey] announced that she would be taking a medical leave just days before the first semester began, neither the day-to-day substitute solution nor the long-term substitute was an appropriate and/or available option. Instead, Dr. Barringer worked to redistribute Anne's special education classes and caseload responsibilities among the other staff. Once done, it is a very difficult task to shift the classes and responsibilities again mid-semester. As of November, your client had indicated that she would not be returning from her medical leave until February 2013. However, when we met December 10 she stated that she would be able to return by January and the district agreed that the start of the second semester would be a good time for transitioning her back into the building. . . [T]ransitioning [Bailey] back to her classroom and curricular role as [sic] the beginning of the semester January 28 was a carefully considered, reasonable and logical decision.

CP at 525. If Bailey chose to return before January 28, Barringer "would guarantee her an assignment somewhere in the district every day until she begins at Kent-Meridian January 25." CP at 526. But he could not guarantee where she might be assigned to teach. And the District would pay Bailey her normal salary rate for any substitute teaching rather than the guest teacher rate.

On January 2, 2013, Bailey's attorney e-mailed Lind about Bailey's plan to work the next day and that she "expect[ed] to perform the same or similar job duties as she performed at the end of last year and for which she has been contracted to perform this year." CP at 535. She said Bailey expected the same treatment as others returning from FMLA leave and wanted no accommodations.

The District repeated its substitute teaching offer. It also questioned why counsel instructed Bailey to return to work.

The next day at 7:30 am, Bailey went to Barringer's office to check in for work. Barringer told her he had no work for her at that moment, but would confer with Lind.

At 9:00 am, Bailey joined Barringer and Lind on a five minute conference call. Bailey described Lind's tone as tense and angry:

> Then he just went into this, like, tirade, very loud, sounding very angry. Your attorney is not your employer; we are your employer. Do you understand? You are not authorized to be here today. Do you understand? Excuse me. You may stay for the day, but you will not be paid. Do you understand? You have no curricular leader duties, you have no teaching assignment, no classrooms, instructional duties. You are not authorized to be here. You were told to report to Human Resources for substitute assignments. Do you understand?

-10-

CP at 288.[2]

On January 6, Barringer e-mailed Bailey about possible work if she returned on January 14. On January 9, Barringer e-mailed the work offer to Bailey again. Bailey responded with an e-mail to human resources about her decision to use the full 12 weeks of FMLA leave "through Feb. 1, 2013." CP at 543.

On January 17, Bailey's clinical psychologist, Mary Galaszewski, PhD, advised the District that in her "professional opinion, Ms. Bailey cannot return to this work environment again," due to her conflict with Lind. CP at 283.

On January 31, Galaszewski sent another note to the District expressing her opinion that "the district attorney's behavior was hostile and intimidating and this caused trauma to my client and exacerbated her condition." CP at 547. She concluded that Bailey could not "return to this work environment again." CP at 547.

On February 1, Lind e-mailed Bailey's attorney to ask for clarification, to request a meeting, and to disagree with how Galaszewski characterized the January 3 telephone call with Bailey.

On February 6, Bailey's attorney responded that Bailey would "follow her medical provider's recommendation included in the letter that has been forwarded to you, that she not return to her employment with the Kent School District." CP at 552.

On February 14, the District wrote Bailey to confirm if she was indeed resigning. The letter informed her the District would treat her actions as a resignation unless it

---

[2] When asked about Lind's tone at the meeting, Barringer stated it was "direct." He said, "I wouldn't call it yelling. I'd call it direct." CP at 328. He said he "didn't sense anger" but thought there might be some "frustration in there." CP at 328.

heard otherwise from her. The District stressed to her that she was "not being discharged or non-renewed." CP at 554.

On February 3, 2014, Bailey filed a lawsuit against the Kent School District alleging claims for employment discrimination, hostile work environment, retaliation, violations of FMLA, intentional and negligent infliction of emotional distress (outrage), failure to accommodate, and disability discrimination.

On March 3, 2015, the District moved for summary judgment on Bailey's claims. In Bailey's opposition to summary judgment, she voluntarily dismissed her claims for failure to accommodate, disability discrimination, and intentional infliction of emotional distress.

The trial court granted summary judgment and dismissed Bailey's remaining claims.[3]

Bailey appeals.

## ANALYSIS

### Standard of Review

Bailey contends the trial court erred by dismissing her claims against the Kent School District on summary judgment. The District argues that Bailey failed to establish at least one essential element on each of her claims.

This court reviews whether the trial court properly granted summary judgment de novo. Scrivener v. Clark College, 181 Wn.2d 439, 444, 334 P.3d 541 (2014). Summary

---

[3] The court indicated that it did not address Bailey's claim for negligent infliction of emotional distress because the District did not challenge that claim on summary judgment. In a filing with this court, Bailey voluntarily dismissed that claim without prejudice under CR 41(a)(1)(B).

judgment is only warranted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Scrivener, 181 Wn.2d at 444. This court views all facts and makes all reasonable factual inferences in the light most favorable to Bailey, the nonmoving party. Scrivener, 181 Wn.2d at 444.

Hostile Work Environment

Bailey argues that the trial court erred by dismissing her hostile work environment claim because she failed to show membership in a protected class.

Bailey's hostile work environment claim falls under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW. The Supreme Court has explained that summary judgment "is seldom appropriate in the WLAD cases because of the difficulty of proving discriminatory motivation." Scrivener, 181 Wn.2d at 445. "To overcome summary judgment, a plaintiff needs only to show that a reasonable jury could find that the plaintiff's protected trait was a substantial factor motivating the employer's adverse actions." Scrivener, 181 Wn.2d at 445. The plaintiff's burden is one of production, not persuasion, and may be proved through direct and circumstantial evidence. Scrivener, 181 Wn.2d at 445.

To establish a prima facie case for discrimination based on a hostile work environment, Bailey must show the harassment (1) was unwelcome, (2) occurred due to membership in a protected class, (3) affected the terms and conditions of employment, and (4) is imputable to the employer. Antonius v. King County, 153 Wn.2d 256, 261, 103 P.3d 729 (2004).

The trial court dismissed this claim because Bailey failed to show membership in a protected class:

Plaintiff's claim that she was subject to a "hostile work environment" stems from her treatment by a co-worker who plaintiff says bullied, maligned and harassed her over a period of years. Plaintiff voiced complaints to her principal about her co-worker's alleged treatment. She does not claim to be a member of a protected class under RCW 49.60.180 nor under any other section of the WLAD (except that pertaining to retaliation which is addressed below.) Therefore, her hostile work environment claim fails and summary judgment is warranted insofar as this claim is not synonymous to her retaliation claim.

CP at 467 (emphasis added).

Membership in a Protected Class

Bailey claims the trial court erred in concluding she was not a member of a protected class. She argues the hostile work environment she experienced "arises out of her actions to protect the disabled students of color." Br. of Appellant at 28.

The WLAD creates several protected classes. It prohibits an employer from discriminating against an employee on the basis of "age, sex, marital status, sexual orientation, race, creed, color, national origin, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability. . ." RCW 49.60.180(2).

Bailey argues that reporting discrimination is a protected activity. She cites Ray v. Henderson, 217 F.3d 1234, 1246 (9th Cir. 2000). Ray is not helpful. That case addressed whether a male worker's sexual harassment report of female colleagues was a protected activity under Title VII. The case did not address the question here— whether a plaintiff who reports alleged discrimination is a protected class member for purposes of a free standing hostile work environment claim.

Bailey also cites Johnson v. Riverside Healthcare System, LP, 534 F.3d 1116, 1123 (9th Cir. 2008), where the court noted that discriminatory conduct directed at an

individual other than the plaintiff "may be relevant to a hostile work environment claim." As in Ray, Johnson does not address the relevant question presented here.

Bailey also claims she is a member of a protected class because she reasonably believed she was opposing discriminatory practices. She relies on the WLAD's retaliation statute, RCW 49.60.210(1).[4] Actions taken in response to an employee's opposition to discrimination constitute retaliation, not a claim for hostile work environment. See Currier v. Northland Servs., Inc., 182 Wn. App. 733, 742, 332 P.3d 1006 (2014).

Bailey's claim also fails because she produced no evidence that Browning's alleged harassment was motivated by plaintiff's race, gender, sexual orientation, or another protected class.

Bailey also argues that her protected class status arises from her actions to protect disabled students. She relies on Johnson. But that case did not address "associational discrimination." Associational discrimination occurs when a nonminority is discriminated against for "siding with" a minority. See Barret v. Whirlpool Corp., 556 F.3d 502, 515 (2nd Cir. 2009); Reply Br. of Appellant at 7.

Even if associational discrimination applied here, Bailey's claim fails because she did not show she suffered adverse actions because of her advocacy for, or association with, students of color. Barrett, 556 F.3d at 515. The record contains overwhelming evidence that Bailey's advocacy focused on herself not for members of any protected class.

---

[4] That statute makes it unfair for an employer to "discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter." RCW 49.60.210(1).

Retaliation

Bailey also claims the District retaliated against her for "seeking accommodation," "filing a charge of discrimination with the Equal Employment Opportunity Commission when [the District] refused her accommodation . . . demoted her after she made her request and forced her out of the workplace with intimidation by [the District's] General Counsel."[5] Br. of Appellant at 30. An employer may not retaliate against an employee for opposing the employer's discriminatory practices or for filing a discrimination claim against the employer. RCW 49.60.210(1).[6]

To establish a prima facie case of retaliation Bailey must show (1) she engaged in a statutorily protected activity, (2) the District took some adverse employment action against her, and (3) a causal link between her protected activity and the District's action. Estevez v. Faculty Club of Univ. of Wash., 129 Wn. App. 774, 797, 120 P.3d 570 (2005). Bare assertions at summary judgment that a genuine material issue exists will not defeat a summary judgment motion in the absence of actual evidence. Trimble v. Wash. State Univ., 140 Wn.2d 88, 93, 993 P.2d 259 (2000).

---

[5] Bailey's briefing alleges a confusing array of District actions she claims are retaliation. But most of her arguments lack meaningful analysis, citation to authority, and consist of conclusory statements. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (appellate courts do not consider claims not supported by references to the record or citation to authority); McKee v. Am. Home Products. Corp., 113 Wn.2d 701, 705, 782 P.2d 1045 (1989) ("We will not consider issues on appeal that are not raised by an assignment of error or are not supported by argument and citation to authority.").

[6] Under RCW 49.60.210(1), an employer may not retaliate against an employee for opposing a prohibited practice:

> (1) It is an unfair practice for any employer, employment agency, labor union, or other person to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter, or because he or she has filed a charge, testified, or assisted in any proceeding under this chapter.

The plaintiff need not show the adverse employment action was a "but for" cause of the protected activity. Allison v. Housing Auth. of City of Seattle, 118 Wn.2d 70, 95-96, 821 P.2d 34 (1991). The plaintiff instead must show that it was a "substantial factor" in the employer's decision to retaliate. Allison, 118 Wn.2d at 95-96.

Where a WLAD plaintiff lacks direct evidence of discrimination, we employ a three-part burden shifting framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). Under this burden shifting framework, Bailey bears the initial burden to demonstrate a prima facie case. If she succeeds, the burden shifts to the District to present evidence of a legitimate, nondiscriminatory reason for its actions. The burden then shifts back to Bailey to produce evidence that the District's stated reason for the adverse employment action is mere pretext. Anica v. Wal-Mart Stores, Inc., 120 Wn. App. 481, 488, 84 P.2d 1231 (2004). Bailey bears the ultimate burden of establishing her claims at trial. To survive summary judgment, she need only show that a reasonable jury could find that her retaliation claims, noted above, were substantial motivating factors for an adverse employment action. Hill v. BCTI Income Fund-I, 144 Wn.2d 172, 185-87, 23 P.3d 440 (2001); Wilmot v. Kaiser Aluminum and Chem. Corp, 118 Wn.2d 46, 71-72, 821 P.2d 18 (1991).

Protected Activity

Bailey claims her request for an accommodation and filing an EEOC claim are protected activities.[7] Hansen v. Boeing Co., 903 F. Supp. 2d 1215, 1218 (W.D. Wash. 2012); RCW 49.60.210. The District does not dispute that these actions constitute protected activity for a retaliation claim.

Bailey also argues that her complaints about Browning constitute protected activity. Bailey claims the District retaliated against her based on repeated complaints about Browning. But the record contains overwhelming evidence that Bailey's complaints about Browning were all about disagreements over student assignments and communication styles. Nothing about her complaints are based on WLAD.

We are not persuaded by Bailey's present claims that Browning disproportionately rejected students of color and Bailey was a "whistle-blower" on Browning's race discrimination. The record provides no support for these claims. For example, Bailey points to no racial remarks or faculty, parent, or student complaints about Browning discriminating against students of color. Bailey presented no relevant evidence that Browning discriminated against students of color. The undisputed evidence shows Browning's preference for teaching only "case load" students. This is a nondiscriminatory explanation and Bailey makes no attempt to show it is a pretext for discrimination.

---

[7] These "protected activities" are also based on Bailey's allegation that the District refused to place her in the non-teaching position she repeatedly requested.

Adverse Employment Action

Bailey claims she suffered an adverse employment action when she requested an accommodation and exercised her right to medical leave.

An adverse employment action "involves a change in employment conditions that is more than an inconvenience or alteration of one's job responsibilities, such as reducing an employee's workload and pay." Alonso v. Qwest Communications, Co., 178 Wn. App. 734, 746, 315 P.3d 610 (2013). Whether an action "is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position.'" Tyner v. State, 137 Wn. App. 545, 565, 154 P.3d 920 (2007) (quoting Burlington North. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 2417, 165 L. Ed. 2d 345 (2006)).

The trial court dismissed this claim because Bailey suffered no adverse employment action:

> When [Bailey] appeared ready to return to her former position as a teacher on January 3, 2013, her employer, after claiming to be caught by surprise, agreed to start her back in that position within two weeks of her return to work and offered to employ her as a substitute teacher in the interim. The evidence does not support an adverse employment action under RCW 49.60.180.

CP at 460.

Bailey claims she suffered three adverse actions: (1) the District demoted her when Barringer told her she had to teach a full class load or resign while she was on leave; (2) the District treated her less favorably from other return to work employees who were immediately allowed to resume their original preleave duties; (3) the District's attorney yelled at her on January 3.

Judged by a reasonable person in Bailey's position, the undisputed facts do not show any material adverse actions by the District. The District was prepared to restore Bailey to her former position soon after her January 3 return to work. The record shows that Bailey's unilateral decision to return to work on very short notice surprised the District. The District offered short-term alternatives at her normal salary and offered to reinstate her to her original duties.

Bailey also argues she suffered an adverse employment action based on her interaction with Lind on January 3. She claims Lind knew she suffered from anxiety and depression and yelled at her anyway. The problem with this contention is Bailey argues Lind's behavior "lead to [Bailey's] constructive discharge." Br. of Appellant at 3-4. We decline to address her constructive discharge claim. She failed to analyze this claim and provided no case authority. This argument is waived. We do not consider arguments unsupported by argument or citation to legal authority. RAP 10.3(a)(6); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Bailey also fails to establish a nexus between the alleged adverse action and protected activities.

Even if we assume Bailey suffered an adverse action based on protected activity, she fails to show the District's nondiscriminatory explanation was a pretext for discrimination.

<u>Pretext</u>

The trial court ruled that even if Bailey proved a nexus between a protected activity and an adverse employment action, she failed to show the District's nondiscriminatory explanations were pretext:

-20-

> Furthermore, even if the evidence taken in the light most favorable to the plaintiff established a nexus between the protected activity and an adverse employment action, the defendant has established legitimate non-discriminatory bases for not creating a non-teaching position for Ms. Bailey when she was requesting it and for not returning her to a classroom on January 3, 2013. Plaintiff has presented no evidence that the reasons stated 1) that no non-teaching positions were funded or available and 2) that putting her in a classroom within a month of the end of the semester would disrupt and adversely affect students have been rebutted by any showing of pretext.

CP at 460.

Under the burden shifting framework discussed above, Bailey does not show the District's nondiscriminatory explanations constitute pretext for discrimination. "An employee may satisfy the pretext prong by offering sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is pretextual or (2) that although the employer's stated reason is legitimate, discrimination was nevertheless a substantial factor motivating the employer." Scrivener, 181 Wn.2d at 446-47. The plaintiff may show this by demonstrating the explanation (1) has no basis in fact, (2) were not really factors for its decision, (3) were not temporally connected to the adverse action, or (4) were not motivating factors in employment decisions for other employees in the same circumstances. Scrivener, 181 Wn.2d at 447.

The District presented nondiscriminatory explanations for each of Bailey's claimed adverse actions. The District did not put Bailey back to work on January 3 because her first request to return to teaching before the beginning of the second semester was at 3:00 pm on January 2. By January 6, the District offered her interim employment. The District reasoned that to reassemble Bailey's students and classes weeks before the end of the semester would cause substantial disruption. The District's actions were the product of "the lateness of plaintiff's change-of-heart, and good

-21-

educational policy." Br. of Resp't at 44. Bailey readily conceded at oral argument that the District was unable to reconstitute her classrooms on short notice without causing significant disruption for her students.

The record also shows the District tried to honor Bailey's request to return on January 3. It offered temporary work as a substitute teacher with the same salary, the same benefits, and the same hours as her original position. The District also offered to let her start work on January 14 doing catch up work on IEPs and other necessary tasks.

Bailey's retaliation claim fails.

FMLA Violations

Bailey argues the District interfered with her right to FMLA protected leave when it (1) required her to exhaust paid leave before FMLA protected leave, (2) declined to return her to her original job after medical clearance, and (3) offered her a non-equivalent job upon her return.

Even if we assume without deciding that the District interfered with Bailey's FMLA right by insisting she exhaust paid leave before FMLA protected leave, Bailey shows no adverse consequence from the District's policy. We need not address Bailey's remaining claims given our resolution here.

Attorney Fees

Bailey requests fees under RAP 18.1 and WLAD, RCW 49.60.030. "RCW 49.60.030(2) does not expressly authorize for attorney fees on review, but it has been interpreted as authorizing such an award." Xieng v. People's Nat. Bank of Washington, 120 Wn.2d 512, 533, 844 P.2d 389 (1993). RCW 49.60.030(2) allows plaintiffs to sue

under the WLAD and "recover the actual damages sustained by the person, or both, together with the cost of suit including reasonable attorneys' fees . . ." Given our resolution of the issues here, we deny Bailey's request for attorney fees.

## CONCLUSION

For the reasons discussed above, we affirm the trial court's order dismissing Bailey's claims.

WE CONCUR: